CITY OF OLIVETTE, a Municipal Corporation, Respondent,

v.

Walter GRAELER et al., Defendant-Appellants,

Industrial Properties, Inc. et al., Intervenor-Appellants.

No. 49385.

Supreme Court of Missouri,

Division No. 2.

June 4, 1963.

Motion for Rehearing or for Transfer to Court En Banc Denied July 8, 1963.

Claude W. McElwee, St. Louis, William E. Gallagher, St. Louis County Counselor,

Richard E. Crowe, Asst. County Counselor, Lewis, Rice, Tucker, Allen & Chubb and James A. Singer, J. L. Pierson and Lawrence A. Waldman, Clayton, for certain appellants.

Fordyce, Mayne, Hartman, Renard & Stribling and Thomas Rowe Schwarz, St. Louis, for Monsanto Chemical Co. and General Electric Co.

Carroll J. Donohue, Shulamith Simon, Husch, Eppenberger, Donohue, Elson & Jones, St. Louis, for plaintiff-respondent, City of Olivette.

EAGER, Presiding Judge.

This is a declaratory judgment action seeking approval of a proposed annexation under the "Sawyers Act" enacted in 1953, now § 71.015, RSMo 1959, V.A.M.S. Various defenses were raised in the answers. It will not be necessary to review the pleadings, for such parts as are material to any issue will be noted later. The suit was filed on February 13, 1957. Industrial Properties, Inc., the owner of considerable property in the area proposed for annexation, was permitted to intervene. The parties originally named as defendants were chosen as representatives of the class of inhabitants of that area and there has been no objection whatever to the validity of this representation. After the first trial, motions of the defendants and intervenor for a new trial were sustained and the petition was dismissed; this was done upon the theory that the areas of St. Louis County lying outside of cities, towns and villages were not "unincorporated area" within the meaning of § 71.015, supra, and thus were not subject to annexation under that Act. Plaintiff appealed. The judgment dismissing the petition was reversed, but the order granting a new trial was affirmed and the case was remanded for trial on the merits. Our opinion appears at Mo., 338 S.W.2d 827.

Following the remand, St. Louis County and James H. J. McNary, County Supervisor, intervened as parties defendant by leave and filed answer. They oppose the annexation. Thereafter, General Electric Company and Monsanto Chemical Company, owners of industrial property in the area, were granted leave to intervene "upon adoption by said intervenors of the pleading of Walter Graeler." The second trial began on March 20, 1961, and the evidence was concluded on July 27, 1961. During that trial other corporations owning industrial property in the proposed area intervened and filed a joint answer by leave of court, as shown in the caption of this opinion. On December 18, 1961, the court entered its decree authorizing the annexation; this will be referred to in more detail later. The "defendants" filed a motion for a new trial and when this was overruled "defendants and intervenor defendants" appealed. It was stipulated at the second trial that the entire transcript of the first trial should be incorporated into the record. Both records are voluminous, and, so far as the first trial is concerned, the facts are sufficiently shown in our opinion at Mo., 338 S.W.2d 827. Jurisdiction was accepted here on the first appeal, on transfer from the St. Louis Court of Appeals (329 S.W.2d 275), upon the ground that a construction of § 18 of Art. VI of our 1945 Constitution was involved. Upon the present appeal the County is a party and this gives us jurisdiction under Art. V, § 3 of the Constitution, V.A.M.S. Certain constitutional questions are also urged here; these will be referred to later.

In general, all original defendants and all Intervenor-Defendants have asserted at every stage: that the proposed annexation is unreasonable and arbitrary; that it is not necessary to the proper development of Olivette; that it is not in the best interest of St. Louis County as a community; that it is unreasonable as to the inhabitants and owners in the proposed area; that Olivette is not in position to furnish services to the area comparable to those which the County can furnish; that the inhabitants and owners in the "area" would receive no benefits.

but, on the contrary, an additional burden of taxation. Plaintiff, in its pleadings, evidence, briefs and argument, has strenuously asserted (affirmatively) the converse of all such propositions.

Much of the second transcript consists of repetition of evidence from the first one. We adopt here the facts recited at 338 S.W. 2d pages 830–832, inclusive, concerning the statistical, political and geographic status of Olivette and of the proposed "area" as of the time of the first trial in December 1957. The area of Olivette has not been enlarged since 1957; its population in 1960 was 8,257. The area proposed for annexation (which we shall usually describe as the "area") lies west of the north half of Olivette; an unincorporated area known as "Elmwood" lies along part of Olivette's north side. The record indicates that the latter is regarded as rather "run down" and not highly desirable, although Olivette did in the past annex a portion of it, and now proposes for that a land clearance project, federally financed.

The area proposed for annexation contains approximately 303 acres. Its boundaries (without regard to streets and roads) are generally: The City of Olivette on the east, perhaps for a mile; the City of Creve Coeur on the south and along a short portion of its west boundary; an unincorporated area along the remainder of its west boundary, and the Rock Island Railroad on the north, across which lies the City of Overland, with some industrial development nearby. In the north part of the present proposed "area" an industrial subdivision of nearly fifty acres was established a few years ago. This is zoned by the County as industrial. In that subdivision there are now warehouses, general sales offices and similar bases of operation, largely of nationally known corporations. The lots are of relatively large size. Just south of the eastern half of that subdivision, another tract of forty acres in the "area" has also been zoned industrial; several lots have been sold and several industrial buildings had been erected or were in the course of erection at the time of trial. These are all substantial buildings, and this land was sold during 1960 and 1961 at prices ranging from about $22,-000 to $24,500 an acre. The original forty-acre tract had been bought in 1958 for something over $5,000 an acre. Both of these tracts (i. e., the subdivision and the forty acres) were selected for industrial development by the purchaser because of their proximity to good transportation by highway, railroad and air, as well as for the general suitability of the land area. Lindbergh Road, or U. S. Highway No. 66, runs along the entire west side of the area; the C. R. I. & P. Railroad skirts the entire north side; Warson Road, a county road, runs along the east side, 150 feet west of the actual boundary. Much of the remaining land in the "area" lies in tracts said to be agricultural; but it seems clear that all of the land in the "area" has clearly grown out of, or has at least been priced out of, the class of agricultural land; a few families continue to reside on it out of sentiment or for convenience, and a few new houses have been built along the very eastern edge. The evidence fairly shows that substantially the whole of the 303 acres is well suited for industrial development. Something more than half of it was still zoned by the County for single-family residences at the time of the second trial; there was some commercial development and a small zoning for multi-family housing. The foregoing, it may be assumed, merely showed the status of the area pending adoption of the new County Land-Use Plan, referred to later. In the northwest corner of the area a sort of finger reaches out between Lindbergh Boulevard and the Rock Island tracks. There is little development there,—a few houses and two or three commercial buildings, apparently of no great consequence. It is zoned industrial.

The roads or streets in or near the "area" are: Warson Road, already noted; Olive Street Road, a state highway (which also runs east and west through the center of Olivette) on the south, but 200 feet inside the north line of the City of Creve Coeur;

Lindbergh Boulevard, along the entire west boundary; and Baur Boulevard, a private road established by the industrial developer, running generally east and west through the original industrial subdivision; this, it is said, is now in the process of being dedicated as a public street. A strip of 150 feet of the unincorporated area lies between Warson Road and Olivette. The assessed valuation of real property in the "area" is $1,529,250.

The industrial development in this area has ample water from two twelve-inch mains running along Warson Road, presumably operated by the St. Louis County Water Company. The water is or could be made readily available to the rest of the "area." The industrial area has ample and approved sewage facilities because its then owner contributed substantially with others to run a large Metropolitan Sewer District line from the northwest corner of Olivette to the area. This line runs partly inside Olivette's north line and partly outside, but it now serves an area in the north part of Olivette. Thus, sewage facilities could likewise be extended in the "area" at normal expense. This sewer line was not paid for, in whole or in part, by the City of Olivette, but various private owners contributed the cost. The area owners also ran storm sewers along Warson Road. The area receives power and light from the Union Electric Company. Little policing of the area has ever been required, but the County police cars patrol the area and have, upon occasions, reported lights left on or windows open; they have also come very promptly when ambulance calls or fire calls were made, and whenever the automatic protection signals in the industrial buildings have failed to function. The industrial part of the area is in the West Overland Fire Protection District, and is entitled to its services. A large part, probably a majority, of the industrial buildings are equipped with sprinkler systems. The firehouse of that fire district is said to be approximately three-quarters of a mile from the corner of Warson and Baur, according

to one witness; further, according to another. The employees of that district are partly paid and partly volunteer, but there are men on duty at all times, with at least three men at the station at night; the district owns two pumper trucks and adequate hose lines and auxiliary equipment. All the men take regular training in fire fighting. It has co-operative contracts with the fire departments of several other nearby communities. Some of the residents in the more sparsely settled parts of the "area" buy "fire tags" from the Creve Coeur Fire Department entitling them to fire protection. The sanitary sewer plans in the area were all reviewed by the County Health Department (primarily as agent of the State Health Department). The County maintains Warson Road; it is said to be somewhat inadequate for the traffic now using it. The County Department of Public Works has reviewed all of the plans for industrial buildings (and presumably others) in the area, has issued building permits and has, through its appropriate divisions, made many inspections of each building, as is its custom, during the course of construction. It approved the plat of the original industrial subdivision. The County adopted a comprehensive zoning plan in 1946, but since 1956–7 it has been working on a new overall and county-wide Land-Use Plan with the assistance of Harland Bartholomew and Associates. This, of course, has been necessitated by the enormous growth of population in the County; it was stated that its total population in 1961 was estimated at 703,000, with 250,000 people living in the unincorporated areas. And, as stated in evidence by the Planning Director of the County,—"areas that have previously been laid out as residential areas must now, of necessity, be changed to industrial or commercial areas in order to give us a reasonable tax base throughout St. Louis County." A proposed county-wide Land-Use Plan had been completed to the stage of public hearings, but was not considered on its merits by the trial court because it had not then been

adopted by the County Council. This plan, when and if approved, would be followed by a new zoning map and ordinance. However, Mr. Wagner, the Planning Director, testified, without objection, that the entire area proposed here for annexation should, in his opinion, be zoned as *industrial;* also, that much industrial growth first occurring in unincorporated areas has been taken into municipalities, and that in this particular part of St. Louis County the land suitable for industrial development is very limited. Mr. Wagner also testified, without objection, that in the new Land-Use Plan all of this "area" was designated as an industrial area, except for a very limited commercial space in the south part along Olive Street Road. Industry had come into this particular area within approximately five years prior to 1961. Very few of the persons employed in industry in the "area" live in Olivette; at one plant employing ninety persons, none lived in Olivette.

Much time and space were consumed at both trials in showing the functions, capacities and personnel of the various County departments. We shall not repeat or digest any great part of that evidence. It will suffice to note these facts. The County has an adequate, competent and up-to-date Department of Police with 117 commissioned officers, 29 civilian employees and all necessary equipment, though limited somewhat in headquarters space, and with an expressed desire (and probable need) for more personnel. The County maintains a Health Department with various divisions, which renders certain material health services to the entire County, including municipalities; this department employs sundry professionally trained people and operates a competent laboratory. Its officials consult frequently with the municipalities on their problems. The sanitation division alone employs sixty-one persons, including six professional engineers and thirty field inspectors; the sanitation services are rendered only in the unincorporated areas, except by contract. The activities of this division include the in-

spection and control of milk processing and sale, food sales, water, sewage, industrial hygiene and sundry other activities. The County Public Works Department includes inspection divisions for sewers, plumbing, mechanical installations and for all electric wiring; this division alone employs thirty-six inspectors. Many of the municipalities of the County use some of these services by contract. The Department also reviews all building plans in the unincorporated area, issues permits, and makes numerous regular inspections during the construction of all buildings. The County employs a Traffic Commissioner with fourteen full-time employees and ten part-time; this staff makes almost continuous studies of county-wide traffic conditions, prepares control plans, makes recommendations to the County Traffic Commission, and frequently consults with the municipalities on traffic problems. The Commission, a citizens' body, is responsible for traffic signs and control devices outside the incorporated areas; the Staff had made traffic surveys in and adjacent to this particular "area." The County maintains a Highway Department acting under a Highway Engineer; it has and operates various types of equipment adequate for the maintenance of the county roads; new construction work is performed largely by contract. We have already alluded to the matter of County Planning and Zoning. The County has a freeholder Planning Commission, which is aided by a paid staff of seventeen persons; five of these are professionals in the field. All applications for zoning amendments are processed through the staff and the Planning Commission. Some of the recent zoning developments have already been outlined. It will not be necessary to discuss the several other county departments, such as administration, welfare, education, etc.

The City of Olivette is a city of the third class, first incorporated in 1930, and having the City Manager-Council form of government. Its population in 1960 was 8,257, having increased from about 1,761

in 1950. Its area is approximately 1,700 acres; it has effected two annexations since its incorporation. The entire city is in the Ladue School District, with several elementary schools located within its limits. It, of course, maintains no schools. Olivette has a city hall, centrally located, which houses its departments and official personnel, including the Police and Fire Departments. The department heads report to the City Manager. There are, in all, twenty-five paid full-time employees and two part-time employees. Its property tax rate at time of trial was sixty-five cents on the $100 valuation; such taxes are supplemented by a gross receipts tax on utilities, a merchants' and manufacturers' tax, automobile licenses, etc. Its remaining bonded indebtedness was $28,000. It was stated in evidence that 95.36% of the land within Olivette was "developed," but it was also admitted that this term and that percentage included all land and tracts upon which any building had been erected, or any subdivision *established* without regard to buildings thereon. We conclude that there is no satisfactory or accurate showing of the approximate amount of vacant and available land in Olivette, either residential, commercial, or industrial. It does fairly appear that there are substantial tracts of vacant land in certain industrially zoned areas, and there is at least a fair inference that much vacant land remains in areas zoned residential and commercial. The principal map used as an exhibit merely shows city limits, subdivisions, streets, zoning (actual or prospective) and a few indications of ownership. It is impossible from any exhibit brought here to determine the *actual* amount of vacant land in any category.

We summarize as briefly as may be the evidence concerning Olivette's municipal departments and services. Its police personnel consists of eight men, all of whom have had training; the department operates three police cars with the usual modern equipment; its radio calls come through the County Police Department, though it

is stated that the City has an application pending for a license. The Department maintains regular patrols of the City. Its records are transmitted to and kept primarily in the Central County Police files. Its fire department employs ten men, plus volunteers, all of whom train weekly in fire procedures. The department has and operates one pumper and sundry auxiliary equipment. It has a co-operative contract with certain other municipalities. It is said that the Department can make a run from its firehouse to Warson and Baur in two and one-half minutes, the distance being 1.7 miles. Olivette's Health Department consists of a volunteer, non-paid director who is evidently a dedicated person; he is a practicing dentist, Dr. E. V. Lambrechts. He has had considerable practical experience and has been accorded recognition in certain health circles. Dr. Lambrechts has no regular employee, but states that he is assisted in his work from time to time by the Police Department, the Fire Department and the Public Works Department. The City thus operates mosquito and rodent control, requires the cutting of weeds, approves plans for and inspects private swimming pools, operates (through private contract) a trash and garbage collection system and inspects septic tanks and stagnant water, using a deodorizing or "sanitizing" service on the overflow where necessary on account of unpleasant odors. At times the fire department flushes out the objectionable places. Dr. Lambrechts knew that the City had no land fill, but he did not know where the garbage hauler dumped the refuse. The City contracts with the County for the services of one of the latter's health inspectors or sanitarians for ten hours per week; this man, or men, with or without Dr. Lambrechts, make various inspections and provide general sanitation services to that extent; under another arrangement the County Department also furnishes rabies control services in Olivette. The City has a Planning and Zoning (Citizens) Commission, which generally considers zoning matters, the approval of subdivisions, etc. When con-

sidered necessary, it employs professional assistance. The City's Department of Public Works consists of a full-time Building Commissioner with one assistant. The Commissioner is a registered architect. These men review plans, issue building permits, enforce the zoning ordinance and many others, and make substantially all of the structural, plumbing, electrical and miscellaneous inspections; they are also responsible for street maintenance and construction, sidewalks, street lighting, and garbage and refuse collection. The City only has sidewalks in the vicinity of two elementary schools. Since the first trial, about 1400 feet of new street construction had been made on Dielman Road, a principal north and south street (with a $50,000 contribution from a private industrial corporation) and an unspecified amount on another street or streets. Many of the streets in Olivette, probably 50%, are still private streets, having been built by developers in the creation of subdivisions and never taken over by the City. The City does not maintain such streets. Many septic tanks remain in the City, though some new sewers are being planned. The Building Code permits either sewers or septic tanks, but there was testimony that the Building Commissioner was requiring sewers on new subdivisions. Since the first trial the City has, by contract with Union Electric, had installed thirty-three street lights, was in the process of installing nine others, and was considering more.

Throughout the trial counsel for Olivette laid considerable stress upon the fact that employees of the County Public Works Department had supposedly approved plans for and issued building permits for two or three industrial buildings in the forty-acre industrial tract in the "area" without first requiring the filing and approval of a "metes and bounds" subdivision plat as it claimed should have been done. This was apparently stressed to show a supposed carelessness or incompetency in that department. The evidence is rather confusing and complicated but,

assuming that a plat should have been sooner required, the matter involves merely a specific error or errors and certainly may not control the real issues before us. The evidence has not convinced us of the incompetency of that County Department. A plat was, according to the evidence, approved and recorded in June 1961, while this case was still on trial.

The Intervenor-Appellants Monsanto Chemical Company and General Electric Company have briefed alleged constitutional issues. Although these are stated in various forms, when boiled down they are: that Sections 18(a) and 18(c) of Art. VI, Mo. Constitution, 1945 (erroneously cited as *Article* 18 throughout the brief), permitting counties of over 85,000 inhabitants to adopt a charter providing for the vesting and exercise of certain legislative powers, reserve such powers to the people of such a county, and constitute a fundamental limitation on all legislative interference; that, therefore, neither the legislature nor any of its creatures may oust or divest the charter government of any of its listed powers, including police, traffic control, public health, building construction and planning and zoning; and that any attempt by a city to annex portions of the county territory are void, as such would constitute an amendment of the county charter, which can only be accomplished by a vote of all the people of the county. Section 18(k). The argument is, thus, that the Sawyers Act is unconstitutional.

In ruling on motions following the first trial, the trial court held the Sawyers Act to be inapplicable because the county territory outside the cities and towns was not an "unincorporated area." This was reversed on appeal. 338 S.W.2d 827. This court there said 338 S.W.2d loc. cit. 836: "Under § 18, Art. VI, St. Louis County was incorporated as a county and not as a city. The fact that constitutional provisions permit the incorporated county to render to certain of its inhabitants services of a local or municipal nature does not change its essential status from that of a

county. It is not the intent of § 18, Art. VI, to make the legal status of a charter county equivalent to that of an incorporated city. The debates of the constitutional convention to which we have been cited by both sides are consistent with this conclusion. * * * Despite its corporate form of organization and all its permissive functions of a municipal nature, St. Louis County is not, as a matter of law, tantamount to an incorporated city within the concept of the annexation statutes. Therefore, the area in question is an 'unincorporated area' within the meaning of the Sawyer[s] Act. The court erred in holding that the Sawyer[s] Act was not applicable."

■ The court thus construed the Constitution and not merely the Sawyers Act, as Intervenors assert. Intervenors also say that the questions now raised are wholly different from those thus adjudicated. We have searched the record and find that *if they are* different, they are not sufficiently raised and preserved. A constitutional question must be raised at the earliest opportunity, kept alive throughout the case, and preserved in the motion for new trial. City of St. Louis v. Butler Co., 358 Mo. 1221, 219 S.W.2d 372; State v. Brookshire, Mo., 325 S.W.2d 497, 500, and cases cited; Ingle v. City of Fulton, Mo., 260 S.W.2d 666. When these two Intervenors entered the case, they were granted leave to do so "upon adoption * * * of the pleading of Walter Graeler." For that pleading, we go back to the prior record. Defendant Graeler and his original associate defendants alleged (in so far as is in anywise applicable here) that: the County was authorized to furnish and was furnishing adequate municipal services, specifying these in some detail; that the "area" was included within "an organized and existing body politic or municipal corporation, organized by the adoption of the St. Louis County Charter, and by reason thereof Section 71.015 RSMo 1949 is not applicable * * *." The point thus raised was precisely the point which this court

ruled adversely to the defendants at 338 S. W.2d 827, and there is no indication in the present record that any attempted extension or enlargement of the point was ever called to the attention of the trial court at the second trial. The two present Intervenors filed no further answer; they have thus pleaded *no* constitutional question which has not been adjudicated. They cannot now make additional arguments on the adjudicated question, nor can they raise, in briefs, new questions. Moreover, in the present motion for new trial, filed by "Defendants" with no specific mention of Intervenors, the following points were raised among others: that St. Louis County was a charter county and a municipal corporation; that the "area" was within its boundaries, and that it was not subject to annexation under § 71.015, RSMo 1949, V. A.M.S. "which applies only to unincorporated areas"; substantially the same allegations were repeated in another paragraph. There is, at best, some doubt as to whether Intervenors actually joined in this motion for new trial but, giving them the benefit of the doubt, no possible constitutional question was preserved therein except the one already adjudicated in our prior Olivette opinion. And we note that these allegations of the present motion for new trial are essentially identical with those of the motion following the first trial, except for the apparently erroneous omission of a line. It is thus demonstrated that even after the second trial the Intervenors were not attempting to raise, or present to the trial court, any new or different constitutional questions. It follows that no new constitutional points have been raised or preserved in the present record and none will be ruled. The opinion of the St. Louis Court of Appeals in City of Olivette v. Graeler, 329 S.W.2d 275, merely held that the constitutional point *which we previously decided* was properly raised.

■ The trial court here found and decreed: that the annexation "was necessary to the proper development of * * * Olivette"; that it was "reasonable" as to

Olivette and "as to the inhabitants and owners" in the area; that it was "in the best interest of St. Louis County as a community"; and that plaintiff had the ability to furnish its normal municipal services within a reasonable time. These findings, as all will note, were most general. When this case was here before, we laid down certain relevant rules for the consideration of the merits. Briefly these were: that upon the consideration of reasonableness, the fact that municipal services were presently being rendered in the area should be weighed; that the people of both the City and the proposed area are entitled to the benefit of the test of reasonableness; that the burden of proof is upon the annexing city; that it is in order to consider what the "proper development" of a city is in the light of existing conditions (such as the multitude of annexations and incorporations in St. Louis County), as an element of necessity and reasonableness; that the development of the county must be considered and "the interest of the county as a community must be weighed against the claims of the city * * *." We shall consider these suggestions along with the usual guides so often laid down in annexation cases.

As already indicated, a large part of this "area" is now zoned industrial by the County; it is apparent from this record that the thinking of the county government is that the whole of the "area" (except for limited existing commercial uses) should be so zoned as part of a larger industrial area in that section, and the County Planning Director definitely expressed such an opinion. It is fair to assume that the County would so treat the area, even without specific consideration of the Land-Use Plan, as such. We have no way of knowing what use or uses Olivette would or might assign in its zoning. There is evidence that it objected to the rezoning of the forty-acre tract to industrial use, and to the rezoning of a smaller tract to multiple dwellings. We shall not attempt to guess its overall reasons. The County's position

is, in part, that it definitely needs a substantial proportion of industrial property in order to maintain a satisfactory tax base. There are no residential subdivisions in the area and comparatively few residences. The land values, in so far as disclosed in the record, are far too high to permit any substantial residential development. There is nothing to show any "overflow" from Olivette, residential or industrial. The selection of the site for this industrial development was made because of its independent advantages, and had nothing to do with the City of Olivette. And it is apparent that the very high land values existing in the area for industrial purposes have had nothing whatever to do with the proximity of Olivette. The present state of the "area" certainly does not represent an expansion or "actual growth" of Olivette. State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007; City of Houston v. Duff, Mo.App., 338 S.W.2d 373.

While the Sawyers Act made important changes in annexation, procedural and substantive, the rules laid down in the cases prior to that Act are still helpful. City of Olivette v. Graeler, Mo.App., 338 S.W.2d 827, loc. cit. 837; City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546. Such cases include: State ex inf. Major v. Kansas City, 223 Mo. 162, 134 S.W. 1007; Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236; Johnson v. Parkville, Mo., Mo.App., 269 S.W.2d 775; Ozier v. City of Sheldon, Mo.App., 218 S.W.2d 133. We shall not attempt to recapitulate all of those rules, but will refer to some in connection with the present facts. There is now no doubt that the Sawyers Act places upon the annexing city the burden to prove the elements required by the Act; those elements include proof that (1) the "annexation is reasonable and necessary to the proper development of said city"; (2) "[t]he ability of said city to furnish normal municipal services of said city to the unincorporated area within a reasonable time * * *." Our former Olivette opinion clearly holds that the issue of reasonableness, both to

the people of the City and those of the "area," is a concept "separate (from) but closely related" to that of necessity to the proper development of the City; that otherwise the requirement would preclude any consideration of reasonableness to the people of the "area," an element long considered. For similar interpretations see also City of Houston v. Duff, Mo.App., 338 S.W.2d 373, and City of Woodson Terrace v. Herklotz, Mo.App., 349 S.W.2d 446. The language in City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 9 [6, 7] concerning "necessity" was used in a discussion of the older cases and should not be taken as indicating the contrary. And we note here that on the issue of reasonableness we held in Olivette, 338 S.W.2d loc. cit. 837, 838, that "modern economic and social trends" must be considered as well as the increased powers and functions of counties and "the interest of the county as a community."

In our view the County is able to furnish all normal municipal services to this area as and when needed, except fire protection, which is available elsewhere. Viewed in this light, the annexation would simply impose city taxes upon the residents and property owners of the area, without the equivalent in added benefits. Jones v. City of Ferguson, Mo.App., 164 S.W.2d 112; City of Creve Coeur v. Patterson, Mo.App., 313 S.W.2d 739 (involving this same area); City of Houston v. Duff, Mo.App., 338 S. W.2d 373. The lands in the area are not valuable "by reason of their adaptability for prospective town uses" (State ex inf. Major, supra) for, in view of the County development, any prospective "town uses" would add little to the existing status. And, by the same token, the land is no more "held to be brought on the market" or developed as town property than as county property. Some of the older rules are thus wholly inapplicable here, because this property can be (and much of it is) as totally and completely developed under the county government as it would be under the City of Olivette or any other municipal govern-

ment. The industries now or hereafter in the area have a labor supply just as readily available now as they would have if the area were annexed. We have already noted that the development of this area is in no sense an "actual growth" of Olivette beyond its boundaries. Major, supra. In no substantial sense is annexation required for the health of Olivette and, in any event, the County is in much better position to furnish health services than is Olivette; nor does the area present any police problem to Olivette.

■ We have sufficiently discussed the evidence and the detailed rules. We conclude that the proposed annexation would not be and is not reasonable to the residents and property owners of the area sought to be annexed; also that, in this instance, the interests of the "county as a community" outweigh the claims of Olivette. City of Olivette v. Graeler, 338 S.W. 2d loc. cit. 838. We do not approve the statement with reference to that opinion in City of St. Ann v. Buschard, Mo.App., 356 S.W.2d 567, loc. cit. 578, as follows: "* * * we think it clear that what was referred to was the interest of the county as a community with respect to the furnishing of municipal services to the proposed area and the comparison of those services with those which the city could offer the proposed area, should annexation be accomplished." Our ruling there and here encompasses and requires a consideration of the interest of the County in the area generally and the effects of the proposed annexation, not only in connection with services rendered, but in a loss of control of the area and in such other ways as would vitally affect the County. Much water has gone over the dam since the writing of such St. Louis County annexation cases as,—City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546 (1949); Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236 (1953); Mauzy v. City of Pagedale, Mo.App., 260 S.W.2d 860 (1953), and perhaps others. The County population has increased vastly and shifted; it

has been desirable and necessary to develop very substantial industries and industrial areas in locations outside of the municipalities; "desirable and necessary" both to the County and to the owners of the property. Some of these areas have been rather promptly annexed by neighboring municipalities, more or less in disregard of the County's interests and those of at least some of the property owners in the annexed areas. We were told at the argument of this case that there were then twenty-nine annexation suits pending in St. Louis County in which the County had intervened. This race for annexations has become somewhat unseemly; as stated in our prior opinion here (338 S.W.2d loc. cit. 838): "There is a great deal of competition between other cities for the unincorporated territory adjoining them."

We said in Olivette, at 338 S.W.2d loc. cit. 838: "The interest of the county as a community must be weighed against the claims of the city because the county's municipal powers are also provided by law and are a part of the public policy of the state." It seems obvious that in this highly developed and substantially urbanized community we have a situation materially different from those which exist in annexation proceedings elsewhere. This "area" has more services and advantages available and has less need for the City's services; the County has the facilities and the organization to furnish the necessary services; the area is, in large part, highly developed through no act of the City, directly or indirectly; and the County here, by annexation, would lose control of an area which constitutes an integral part of its future plans. In such a situation it would be difficult to establish an overall reasonableness and necessity, considered in the light of our recent constructions of the Sawyers Act.

We are wholly unwilling, at this time at least, to consider the St. Louis County government organization as an "interim device," intended merely to operate during a transition period and until the "* * *

areas had developed so as to be susceptible of municipal government * * *." This the plaintiff suggests. And it will correct nothing here to add the burden of city taxes in the proposed "area" even if, as plaintiff states, the municipalities already pay approximately five-sevenths of the county taxes. Olivette would still pay, on its present territory, the same county taxes after annexation. This record contains no suggestion of raising the county tax rate in order to provide increased services, but rather a suggestion of the necessity of maintaining an adequate tax base by the retention and building up of industry. So long as the County has an effective county organization, it should not be whittled away to a mere shell by annexations which have as their prime purpose the acquisition of more city taxes. It would seem that ultimately there must be some overall and far-reaching solution to this problem, but such a solution is outside the domain of this case. In the meantime, some cities may wish to consider consolidations, particularly if they desire, as is indicated in Olivette's testimony here, to become large enough and populous enough to attain Home Rule status.

We have not discussed, specifically, the requirement that the annexation be "necessary to the proper development" of Olivette. Obviously, it would be desirable from the City's point of view. This requirement, while separate, is "closely related" to that of reasonableness. Having found the proposed annexation unreasonable in the respects noted, we need not pursue the question of "necessity" further. We do note in passing that no necessity has been shown for the extension of Olivette's streets into the "area," that one is required to pass through a portion of Creve Coeur in order to reach the "area" on the only through road or street (Olive Street Road), that no extension of police regulations is necessary, that no substantial health hazard is shown (any more than in Olivette itself), that there is no necessity on Olivette's part for the extension of gas,

water or sewer lines and that it would have nothing to do with any such, and that there is no interdependence between the people and business of the area and the City of Olivette.

In our view plaintiff has not met its burden of proving the elements required by the Sawyers Act. In so ruling we do not usurp the legislative function, but merely hold that there was no substantial evidence to show that the proposed annexation was reasonable. The so-called "debatable" rule merely means that if there is substantial evidence both ways, then the legislative conclusion is determinative.

State ex inf. Mallett ex rel. Wommack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, loc. cit. 398. And the "issues of reasonableness and necessity and the other fact questions in a Sawyer[s] Act case should be determined in the same manner that such issues are decided in other actions." Olivette v. Graeler, 338 S.W.2d 827, loc. cit. 837; City of Houston v. Duff, Mo.App., 338 S.W.2d 373, 381.

The judgment is reversed with directions to the trial court to dismiss plaintiff's petition.

All of the Judges concur.