CITY OF FARMINGTON, Missouri, a municipal corporation, Plaintiff-Respondent,

v.

Arlie R. McCLARD et al., Defendants,

Earl Comte, E. J. Morris, Byron Harrington, Jim Slough and Eugene Pogue, Defendants-Appellants,

and

Milton J. Schnebelen, Robert A. Huckstep, Denis Herbst, Clifton A. Sutherland, Eugene Herbst, Jack Cash, Warren Yancey, George Wooldridge and Sam Jennings, Defendants-Appellants.

Nos. 33008, 33010.

St. Louis Court of Appeals.

Missouri.

Jan. 21, 1969.

E. L. McClintock, Jr., Flat River, for defendants Arlie R. McClard and others.

E. L. McClintock, Jr., Flat River, for defendants-appellants.

Milton J. Schnebelen, Farmington, pro se, and for defendants-appellants.

Smith & Colson, Farmington, for plaintiff-respondent.

TOWNSEND, Commissioner.

Class action by the City of Farmington, a fourth class city against twenty-one named defendants, seeking, under the provisions of § 71.015, Laws of 1959, a declaratory judgment authorizing the annexation to the city of 991 acres owned by the defendants. Fifteen of the defendants answered in two groups; four others served were never represented. In the course of the trial the court gave leave to defendant McClard to withdraw his answer.

The answering defendants have alleged that the proposed annexation is unreasonable, unnecessary and arbitrary, and not in the best interests of the City of Farmington, that the city is not in a position to furnish normal municipal services to the proposed area within a reasonable length of time, that the inhabitants and owners within the proposed area would receive no benefits from the proposed annexation but would be subjected to an additional burden of taxation and that as to them such annexation would be unreasonable.

From a judgment authorizing the annexation defendants prosecute this appeal.

■ In a proceeding such as this it is the function of the appellate court to review the case de novo and to arrive at its conclusions respecting the law and the facts. Here the case presents no issue of credibility.

Section 71.015 V.A.M.S. (Sawyer Act) provides as follows:

"Whenever the governing body of any city has adopted a resolution to annex any unincorporated area of land, such city shall, before proceeding as otherwise authorized by law or charter for annexation of unincorporated areas, file an action in the circuit court of the county in which such unincorporated area is situated, under the provisions of chapter 527 RSMo, praying for a declaratory judgment authorizing such annexation. The petition in such action shall state facts showing:

1. The area to be annexed;

2. That such annexation is reasonable and necessary to the proper development of said city; and

3. The ability of said city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after said annexation is to become effective. Such action shall be a class action against the inhabitants

of such unincorporated area under the provisions of section 507.070, RSMo."

There is no need to elaborate here upon the procedural and other changes effected by the adoption of this act. It has been the subject of voluminous judicial consideration. City of Olivette v. Graeler, Mo., 338 S.W.2d 827; City of Olivette v. Graeler, Mo., 369 S.W.2d 85; City of Bourbon v. Miller, Mo., 420 S.W.2d 296; City of Cape Girardeau v. Armstrong, Mo.App., 417 S.W.2d 661, 664; City of Aurora v. Empire District Electric Co., Mo.App., 354 S.W.2d 45; City of Houston v. Duff, Mo. App., 338 S.W.2d 373.

Central to the present controversy is the location of Highway 67 which may be explained as follows:

Old Highway 67 entered the incorporated area of Farmington at its extreme northwest corner and ran eastwardly and southeasterly across the northern and eastern portions of the city and exited at the eastern side of the city. Highway 67 has been relocated and now departs from the former route of 67 at a point approximately 3800 feet northwest of the extreme northwest corner of the city; it then runs almost due south, thus by-passing the city entirely. In this southerly course Highway 67 is a non-access highway for a distance of approximately 9200 feet: none of plaintiff's maps shows any means of access from the east for this distance. West Columbia Street, within the city, runs generally northeast to southwest; when it reaches the vicinity of the southwest corner of the city it is referred to as Highway W. About 2000 feet southwest of that southwest corner of the city, Highway W reaches Highway 67 and here one finds the first mapped access to Highway 67 from the east.

The area proposed to be annexed is traversed from north to south by Highway 67. The limits of that area may be described by segments as follows:

1. Commencing at the point where old Highway 67 leaves Highway 67 and running northwest 1950 feet and then jogging southwest about 1500 feet;

2. Thence north to south 10800 feet;

3. Thence northeast 4200 feet to the southwest corner of the presently incorporated area;

4. Thence approximately north along the present city line 2700 feet;

5. Thence northeast along the present city line about 1000 feet;

6. Thence north along the present city line 3900 feet to the center of old highway 67;

7. Thence northwest along the center of old Highway 67 1900 feet to the point of beginning.

The east line of Highway 67 varies from 2400 feet to 1600 feet west of the present city line. On the west side of Highway 67 the proposed annexation includes an area approximately 1950 feet wide and 10800 feet long (N and S).

There is thus presented for consideration an irregular tract varying roughly from 3900 to 4800 feet in width and at some points exceeding 10000 feet in length (N and S). Plaintiff's exhibit designates 991 acres as the total area comprehended by the proposal. Within that area there are sixteen houses and other farm buildings.

The mayor of Farmington testified that generally most of the area is farm land, a matter well verified by defendants' photographic exhibits. Seven witnesses, owning 457 acres within the proposed annexation area, each testified to his agricultural and live stock use of his property. Two other owners described their holdings as "just home". None of the witnesses had any intention to subdivide his property; none saw any benefit to be derived from annexation and hence each preferred that his property remain outside the city.

Neither the mayor nor Mr. Sailor, the chairman of the council's water committee, nor the City Engineer, knew of any person

or group who contacted city officials and requested the annexation of the area now proposed for annexation. Neither knew of any person other than defendant McClard who had indicated an intention to subdivide his property. And Mr. Sailor knew of no person in the proposed annexation area, other than McClard, who had requested the extension of any city services to his land. There were no public hearings by the City Council relating to the determination of the area to be annexed.

Of the owners of land within the proposed area who testified, at least five have their own deep wells (two of them have two each), another has his "own water supply" and another has five ponds, sufficient for his live stock needs.

Near the southwest corner of the city and lying immediately north of Highway W is the land owned by defendant McClard, which is bisected by Highway 67. All the McClard land lies within the proposed annexation area. Highway W passes over Highway 67; near the overpass there is access to Highway 67 from Highway W. Approximately 825 feet northeast of the overpass McClard has erected a filling station on the north side of W. His architects have prepared landscape plans for the commercial and residential development of that part of the McClard land lying east of Highway 67.

In May, 1963, the city entered into a contract with General Planning and Resource Consultants, Inc., for the preparation of a comprehensive survey and plan for the city which included an analysis of the economic base of the city, marketing studies, employment projections, housing needs, land uses, streets and recreational facilities, financial and tax structure and general demographic studies, all with the purpose of making recommendations on future land use development, transportation systems, school and recreation programs— "in other words, a fairly comprehensive program for the physical development of the community". The consultants filed their report in October, 1964, and the same has been introduced into evidence. The cut-off date for the projection period was 1985. The consultants examined the land uses within the city, parcel by parcel, and for a three-mile area around the city. The population was found to be between five and six thousand in 1964 and, on the basis of the studies made, the population in 1985 was projected to be between eleven and twelve thousand. The city presently occupies 1831 acres. At the time of the report one-half the land within the city was vacant. The consultants' land use map has been up-dated to the week of the trial and shows that between November 1964 and January 1967 approximately fifty-five platted residential lots were occupied by new structures, as were nine platted lots outside the city limits. In addition the up-dating indicates the development of two small commercial areas, an industrial site and a new school.

In its report on a Comprehensive Community Plan, the consultants recommended five areas adjacent to the city for annexation, designated and described as follows: Area 1A, lying immediately west of the present city limits and running westward only to the present Highway 67, an area of 456 acres; Area 1B, lying immediately north and northwest of the present city limits, 780 acres; 2A, an area lying immediately west of present Highway 67 and said to contain 1260 acres; 2B, an area immediately south and southeast of the present city, 904 acres; the fifth area, the site of the State Hospital, southwest of the city. Area 2A "provides an excellent opportunity for a planned industrial-warehouse complex" says the report. When areas 1A and 2A are combined it will be seen that the consultants' recommendations for annexed areas would carry the western limits of expansion much beyond the western limit of the area now proposed to be annexed. The mayor of Farmington knew of no reason why the City Council, in passing its annexation ordinance, stopped short of the western

limits proposed by the consultants, nor why the suggested annexation areas to the north, south and southeast of the city were not included in the presently proposed annexation. A member of the Council testified that the Council thought that westward expansion to the outermost limits recommended by the consultants would be too much for the city to finance.

Immediately adjacent to the city on the north lies a platted subdivided and populated unincorporated area known locally as Electric Place. Water is supplied to this area by Farmington; it receives electrical service from Union Electric Company. The mayor did not know why it was not included in the present plan of annexation; it is more thickly populated than the area now proposed for annexation.

The mayor of Farmington gave the following testimony regarding the servicing of the proposed annexation area:

"Q. Mayor, do you have an opinion as to whether the City would be able to service this area by sewers and water should the court permit annexation, permitted a vote on annexation, of this area?

A. Well, on this present plan it goes to that, planning to be able to take care of it. How long it would be, I couldn't say, but we were planning to be able to.

Q. At what stage is the planning insofar as the sewer is concerned in that area, if you know?

A. I just don't know how far along it is. We have the plans and all but—"

Here counsel for the city interrupted with "All right. That is all I have with this witness."

Later, under cross-examination, the mayor was asked:

"Q. And I believe you testified that you thought that sometime in the future you could provide services to this area but you didn't know just when?

A. No, sir.

Q. You have no knowledge in that connection, is that correct?

A. We are working towards it but don't know how long it will be.

\* \* \* \* \* \*

Q. What is the status of this proposed addition to the sewer system in the City of Farmington? A. I don't know exactly how far along it is. We have had our proposal. We have accepted it. We have filed with the State and I believe with the Federal Government."

Mr. Sailor was questioned on the same subject:

"Q. Do you have an opinion as to how long this project will take to complete?

A. I have an opinion, sir.

Q. Can you give me that opinion?

A. I would say that if funds were approved and allocated at this moment that the entire project could be completed within, say, two years. This is an opinion."

The problematical state of the sewer project is made evident by the further testimony of Mr. Sailor: "If we do not obtain the funds to do what we would hope to do, the present plan would be to expand our present system on the east side of the city which these engineers inform us can be done. Now, that could be done at a cost of about half what we would plan entailing in the overall expansion. There is a codicil in this report stating that this can be done. In other words, if the State is unable to cooperate, if the Federal Government is unwilling to cooperate or unable, then we have an alternate plan in mind which would take care of the City of Farmington as it now stands and might stand for some years. \* \* \* If the federal grant cannot be obtained, we will then reassess the situation and run another engineers report and plan to ex-

tend our present system and simply obviate service to this particular area * *."

City Sewer System:

The city's sewage treatment plant is located outside the city limits to the southeast; it is described as a sludge trickling filter plant and was designed for the handling of a million gallons of sludge per twenty-four hours. The topography of the city is such that it is divided roughly into two drainage areas for sewer purposes; three-quarters of the city drains to the east and southeast, while the remaining one-fourth drains to the west. In order for sewage in the latter area to reach the mains leading to the treatment plant, it has been necessary to establish two pumping stations in the western one-fourth of the city which operate to elevate sewage over the ridge and eastward. There are some small residential areas within the present boundaries that are without sewage service and others where there is recurrent overflow of sewage to the surface. The low point of such westerly drainage lies outside the city limits along a small creek and immediately east of Highway 67.

Near the end of 1965 the city entered into a contract with an engineering firm, William G. Riddle and Associates, to make a survey and report relative to the sanitary sewage works of the city and to make recommendations for their improvement, having particular reference to a proposed expansion of the city to the west and northwest. This firm has recommended the installation of a trunk sewer running generally north and south along the small creek previously mentioned and generally paralleling Highway 67; this sewer would commence in the northwest quadrant of the city at old Highway 67, run inside and outside the city limits in its southerly course and leave the city at its extreme southwest corner to make its way to the premises of State Hospital No. 4 where it is proposed to establish a lagoon system of sewage disposal for the benefit both of the hospital and the city—a project which

the City Engineer opines would require an act of the Legislature. This proposed sewer has been designed to provide drainage, not only for the western one-quarter of the present city, but also for all the territory lying to the west up to the first ridge line, a distance of approximately 1½ miles according to the scale of the maps introduced.

The trunk sewer so projected contemplated the elimination of the two pumping stations in the western quarter of the city inasmuch as the sewage previously elevated and pumped eastward to the treatment plant would, after completion of the sewer, be directed into that sewer for carriage to the lagoons to the south.

In making recommendation of the trunk sewer and the establishment of sewage lagoons in the vicinity of the State Hospital, the head of the engineering firm has assumed co-operation and participation by the state and the grant of a federal subsidy by the Water Pollution Control Administration. The engineer's estimate of the cost of the trunk sewer and lagoons is $420,000. The head of the Riddle firm initiated conferences with the State Director of Building and Construction regarding participation by the State and at the time of trial the matter was under review by the latter's engineer. Applications for Federal aid in construction of pollution abatement facilities were forwarded to the State Director of the Water Pollution Board, which processes such applications. Mr. Riddle was of opinion that there would be pollution abatement funds available under Public Law 660 and it was his expectation ("it is reasonable to anticipate") that the participation by the Water Pollution Control Administration would be in the amount of thirty per cent of the cost of the trunk sewer and lagoons and appurtenant connections. The balance of the cost of such construction would be divided between state and city in the ratio of the populations expected to be served by such facilities, which the Riddle organization computes at one-third for the State

and two-thirds for the City.* Such a division of costs would result after federal subsidy in the City's share amounting to roughly $189,000.

The chairman of the city council's water committee, also on the sewer committee, has expressed it as the council's opinion that on a proposed sewer construction cost of $450,000 the city's share of that cost could be met out of current general revenue without any necessity of borrowing through a bond issue. This opinion is based upon the assumption that the sewer construction would be completed and paid for by stages as the work progressed.

While it was contemplated that the projected trunk sewer could provide drainage for all the area lying to the west of it, still in order to do so, it would be necessary to run lateral tunnels under Highway 67 (three are suggested in the testimony) and to build extensive tap lines into the proposed annexation area. At the time of trial the sewer plan as submitted did not provide for any installation west of the trunk sewer. Nor does it appear that the estimates of construction costs included the cost of any such western installations.

The relationship of the projected trunk sewer to the annexation proposal is a highly contingent one. While the completion of the trunk sewer project would be necessary if the land is to be annexed, the annexation of the land is in no sense a condition upon the building of the sewer. We note the testimony of Mr. Sailor of the Council:

"Q. Aren't you saying that if the State goes along with this and you obtain your funds you would go ahead with this proposal of the engineers regardless of whether this property is annexed or not?

A. This is probably true, yes."

And the testimony of the City Engineer:

"Q. The thing I want to get clear in this record, Mr. Turley, is that is it correct to say that in your opinion the city would be better advised to go right ahead with this plan as provided and as proposed by Mr. Riddle whether or not this annexation is permitted at this time? Wouldn't that be the best plan to follow in your opinion?

A. I don't believe that this annexation would have anything to do with holding up the sewer line.

\* \* \* \* \* \*

Q. \* \* \* In other words, \* \* \* there is really no real relationship as to whether this property is annexed in to the city at this time or not and whether or not this sewer system is carried out along this plan, is there, as far as you can see?

A. Well, of course, you have spent a lot of money for planning, see \* \* \*. And there must be some reason for having that planning, \* \* \*. \* \* \* Well, the planners are the ones that want that annexed, see."

Water System:

At the time of trial the city's water supply was furnished by five producing wells drilled in different parts of the city. In addition a sixth well was expected to come in within thirty days with an anticipated production of two hundred fifty gallons per minute. In the opinion of the City Engineer the City would be able to furnish an adequate supply of water to the proposed annexation area if the annexation took place. The City now has an eight-inch water line extended to a point on the western limits of the City; the City Engineer estimates that that line would be sufficient to serve five or six hundred acres of residential area. The latter line was extended to the city limits at the request of a landowner owning land outside the city limits, McClard; that landowner took the

---

* The Riddle report allocates a population of 2500 to the hospital and 5150 to the city. The latter figure is the anticipated city population of the drainage area served —after annexation but at some unstated future date.

water at the city limit line and bore the expense of conducting the water on and through his property. The City at present furnishes water to several areas outside the city limits—Electric Place, the Osteopathic Hospital, a factory, various homes outside the city.

Electric Service:

The city owns a municipal electric distribution system which services the present city area and furnishes electricity to an adjacent area. Otherwise the contiguous territory is serviced by Union Electric Company which provides full service to the contemplated annexation area.

Fire and Police Protection:

The city maintains a tax-supported volunteer fire department which provides service at any point in the area surrounding Farmington. When called to a location outside the city limits the city sends a truck and only two men. Within the city limits two trucks are available and a full company of men. For the service outside the city, no fee is charged. The mayor knows of no occasion in recent years to answer a call to the proposed annexation area.

The Farmington police department consists of six officers, including the chief. It is equipped with two police cars. The department is radio-equipped so that it has two-way communication with the Sheriff's office and also within the department. The Sheriff of St. Francois County characterized the department as efficient and of aid to his office, since "there isn't enough policemen in the City of Farmington, the Sheriff's department either." The Sheriff's office now provides police protection for the proposed annexation area whenever called, as was testified to by residents of the area.

We do not find that plaintiff's evidence satisfies the requirements of Section 71.015, V.A.M.S., for a declaratory judgment of the type here sought.

There is nothing in the evidence which would cause one to forecast with any degree of confidence that within a reasonable time sewage service would be made available to the proposed annexation area. Indeed the plans for the trunk sewer are so conditioned upon the grant of a federal subsidy and upon participation by the state in the cost of construction that the whole scheme is rendered doubtful and uncertain. That the City Council is well aware of the dubiety of the consummation of such a plan is made clear by the fact that there is an alternate plan under which the City's sewage problem would be solved without providing any such service to the annexation area at all. The availability of funds from either the federal government or from the state, so necessary to initiate the improvement, is so uncertain that any finding as to probability would be mere guesswork, without considering the cost to the City of laying lateral sewer lines sufficient to service 991 acres.

There is no evidence that arrangements are afoot to extend the municipal electrical distribution system to the proposed area. This is perhaps a matter of slight moment since the area is already adequately served by Union Electric Company. But the latter fact points up the conclusion that such extension of the municipal system would be of slight, if any, gain to landowners within the area.

The evidence tends to show that the City's water supply is ample to satisfy the needs of residences and business houses which might be established in the area.

Proceeding to the other conditions precedent to judicial authorization, we find that the annexation must be "reasonable and necessary to the proper development of said city." The conjunction of reasonableness and necessity has had the consideration by the Supreme Court and it has been held that "The provision in question embodies two separate but closely related concepts; that is, (a) that the annexation is reasonable, and (b) that the annexation

is necessary to the proper development of the city. * * * Both parties are entitled to the test of reasonableness." City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 836–837.

There is here no showing of any immedidate need for the city to extend its boundaries. The present situation is not one where the population is spilling over the city boundaries as evidenced by the platting and subdividing of adjacent areas and the erection of homes therein. The only outside subdivision brought into evidence is Electric Place. While there is no detailed testimony on the subject we are told by the planning consultants that approximately one-half the area of the city is vacant. Under such circumstances it cannot be said that the progress of the city suffers from a dearth of building sites. Much less do the facts show a need to annex a relatively uninhabited area which would increase the incorporated area by more than fifty per cent.

However, "a city may, to a reasonable extent, look to its furture needs in planning and making an annexation." City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 18. Here, to forecast the future needs of Farmington to have more living space we should have positive evidence of substantial growth in order at least to give prophecy the simulacrum of reality. At this point inevitably one must indulge in some degree of speculation. We do not believe that the evidence here, despite the analyses of city planners, gives reason to believe that the city is on the verge of a population explosion or that there impends a marked probability of industrial or mercantile development within the foreseecable future. We cannot discern by what horoscope the city's future is to be cast. It cannot be found that the present or future needs of the city require the annexation here proposed.

There remains the statutory condition precedent of reasonableness. Given the lack of any definite finding of present or future need for the proposed annexation,

the quantitative aspects of the proposal raise doubts as to its reasonableness. The mere disproportion between the size of the present city, 1831 acres, and the size of the proposed annexation, 991 acres, gives substance to the doubt. "* * * what is reasonable for the future should be judged chiefly from the known and existing facts." City of Bourbon v. Miller, Mo., 420 S.W. 2d 296, 303. It seems altogether likely that the annexation of a certain part or certain portions of the presently proposed annexation area would be found to be reasonable if that certain part or portions were alone the subject matter of the annexation ordinance. But in a proceeding such as this the Court is without power to perform such an amputation. To purport to authorize annexation of a part of the proposed area and to disapprove annexation of the balance would be an invasion of the legislative field of the city council and hence nugatory. The areas proposed by the council for annexation are an integral whole and not subject to judicial division. City of Bourbon v. Miller, supra, at 301.

Even if the proposed annexation could be held to be reasonable as to the city and its inhabitants, it must meet a further "reasonable test": "* * * both parties, the city and the area proposed, are entitled to the benefit of the test of reasonableness. * * * In other words, the annexation must be reasonable as to those living in the outside area, as well as to those living in the city." City of Bourbon v. Miller, supra, at 300. Viewing the proposal from the standpoint of landowners within and the residents of the annexation area we do not find that the proposal by which they would be drawn within the city would be reasonable as to them. Those landowners who testified wished not to be annexed. They saw no benefits to accrue to them by virtue of annexation. The evidence as to any benefits is only indirect and inferential and any benefits that would accrue would be only marginal—some slight added police and fire protection. The city could extend to them some services of which they now stand in no need—

water and electricity. Their lands would be subjected to another layer of taxation and to possible police regulation for which there is no demonstrated need.

The judgment is reversed; cause remanded to the Circuit Court of St. Francois County, with directions to dismiss plaintiff's petition.

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, the judgment is reversed; cause remanded to the Circuit Court of St. Francois County, with directions to dismiss plaintiff's petition.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.