**CITY OF BOURBON, a Municipal Corporation, Respondent,**

**v.**

**Frank MILLER and Catherine Miller, his wife et al., Appellants,**

**Eugene E. Johnson and Geneva E. Johnson, his wife et al., Defendants.**

**No. 52957.**

Supreme Court of Missouri, In Banc.

Nov. 13, 1967.

G. C. Beckham, Steelville, for respondent.

Samuel Richeson, Dearing, Richeson, Weier & Roberts, Hillsboro, for appellants.

EAGER, Judge.

The action involved here is a declaratory judgment suit seeking approval of the annexation of two tracts of land to the plaintiff, a city of the fourth class. The trial court approved the annexation, and a majority of the defendants appealed. The defendants were chosen as representatives of the property owners in the two tracts and there is no contention that they do not fairly represent those classes. Plaintiff alleged that the annexation sought was "reasonable and necessary to the proper development of the City," and that it was "in position to furnish * * * the normal municipal services of the City * * * as same may be needed, and within a reasonable length of time * * *." Defendants' position is that the annexation is unreasonable, unnecessary and arbitrary, and that the city would not be able to furnish normal municipal services to the areas within a reasonable time. The proceedings were instituted by a resolution adopted by plaintiff's Board of Aldermen on January 7, 1964. The appeal came first to this Court, but the cause was thereafter transferred to the Springfield Court of Appeals for lack of jurisdiction. An opinion was written and filed there on February 17, 1967; we ordered the case transferred here, upon application of the defendants. The opinion approved the annexation of one tract and disapproved the annexation of the other. We shall adopt, without quotations, parts of the statement of the facts made by the Court of Appeals, with or without changes.

Bourbon is located near the northeast corner of Crawford County, Missouri, 22 miles from the county seat at Steelville, and about 70 miles southwest of St. Louis. In 1960 it had a population of 779. In 1940 its population was 363, and in 1950, 543. At the trial a witness stated that the then population "will exceed 1,000." The St. Louis-San Francisco Railroad runs through the approximate center of the town; old U. S. Highway 66 also runs through it and new Highway 66, now Interstate 44, skirts

a part of the east side and runs through the north part. The main body of the city is more or less rectangular but an irregularly shaped area extends to the southwest for approximately a mile. The south part of this extension (containing approximately 45 acres) is described as "Siebenman Acreage Subdivision," and was annexed to the City of Bourbon about one year before the present trial.

The city has no municipal electrical service and we assume, because of the lack of evidence, no municipal hospital or health services, no library, no park system, no garbage collection service, no zoning or planning ordinances, and no provision for the construction or maintenance of streets except, perhaps, from general funds or "gas tax" revenue. Nothing in the transcript indicates that annexation is required to secure uniform grade or alignment of streets in the areas sought, to maintain the peace, or make police ordinances effective. Likewise, the record indicates that the land proposed to be annexed is not needed by the city for water supply, sewer, or other utility purposes. Bonds for a municipal gas distribution system "have been voted," but when, if ever, such a system might be put into operation depends on the "Illinois-Oklahoma Corporation" securing permission to build a gas line through Missouri along U. S. Highway 66. Annexation will have no effect upon the public school system, either for those presently residing in Bourbon or those living in the outlying community.

The assessed valuations of the "property" in the city were: $521,450 in 1955, $624,880 in 1960, and $851,420 in 1963. Revenue derived from a $1.70 levy amounted to $14,477.16 in 1963, and gross receipts were $19,074.78. The city anticipates a $200 monthly income from the state gasoline tax, and one dollar per month per sewer hookup, of which there were 85 when the testimony was heard. Revenue from its municipal water system was not shown. The city owes a $51,000 balance on its water revenue bonds and $65,000 on a

sewer bond issue of $68,000. Three efforts to gain approval of the city's $125,000 limit for sanitary sewer bonds were defeated; finally, the $68,000 issue was approved, and the first phase of the system was put into operation in October, 1962; the second and last phase followed in July, 1963. There are no plans for extending or enlarging the existing system. Of the 85 sewer connections in the city, 50 were residential; the others were for businesses. About ten additional connections are possible and one witness estimated that only one-fourth of the present town is served by the sewers. More bonds would have to be voted before there could be any expansion of the present system and, from past results that would seem unlikely, particularly insofar as it might concern a large, new area.

The municipal waterworks consist of two wells equipped with pumps of 350 and 125 gallon per minute capacity. Ten exploratory drill holes "given" to the city by American Zinc, Lead and Smelting Company are said to be available for other water wells if necessary. This system also includes a 75,000 gallon water tower and a 30,000 gallon tower. Apparently water is available to all parts of the city and to anyone immediately outside the city limits willing to pay for extending the lines and paying for the service. The mayor testified that the present wells, pumps and tower facilities were adequate to supply water to the proposed annexed areas and that the city had a $10,000 surplus "in our water system" that could be used for expansion. Of the 361 connections existing in 1964, 35 to 40 were to customers outside the city limits.

An "organized volunteer fire department" serves the city and apparently all the neighboring community. There is a 20 cent city tax levy to support it. In addition to hoses, ladders, etc., the fire fighting equipment consists of a 1938 model pumper, a 1953 model pumper, and an 800 gallon water tank truck with portable pump acquired in 1963. The 1938 pumper and firehouse were purchased with donations made

by people residing both within and without the city. It was not made clear whether those outside the city now contribute to the fire department.

Until a month before trial time the city's police department consisted of one officer paid $250 a month. The second officer added to the force is paid $15 a month by the city; the balance of his salary is supplied by Bourbon businessmen. Both officers are deputy sheriffs and act in such capacity when performing official duties beyond the city boundaries. They may therefore be called outside of the city through the sheriff's office.

The city's claim for annexation is predicated entirely upon the alleged shortage of rental housing and residential building sites within its present limits; and it contends that this situation will worsen when an anticipated new iron mine beneath and adjacent to the town is constructed and commences operations, and also if and when a lake proposed nearby becomes a reality. No mention is made of any need for business or industrial lands. The evidence as to available rental housing is couched in two brief conclusions, to-wit: Mayor Rhodemeier—"It is utterly impossible to find a rental place at the present." President of the Board of Aldermen—"At the present, it is pretty hard to rent." Aside from a tract owned by a Mrs. Roosman and the Siebenman Acreage Subdivision, both inside the present city boundaries, the mayor contended there were no "suitable lots" available for building, whereas two aldermen estimated that there were 20 to 50 lots. The Roosman land consists of 12 to 15 unplatted acres which the owner refused to sell to the city for park purposes because "she didn't need the money." There is no definite testimony as to whether or not the owner would sell for housing purposes or for a subdivision. Siebenman Acreage Subdivision, annexed to the city a year before trial, contains 38 platted lots which represent about one-fifth of its total area. For some unknown reason an additional

four platted lots were not annexed with the rest of that property, but these are now included in Tract No. 2. Only four houses have been built on the platted area of the subdivision. At least one-half of the unplatted portion of this subdivision is said to be suitable for residential building and this would provide space for an additional 100 to 150 lots. There was testimony that the owners of that subdivision would not sell a lot unless they were also permitted to build the house and sell it; they are nevertheless in the market to sell houses.

The American Zinc, Lead and Smelting Company has acquired surface and mineral rights to 1,130 acres just outside the corporate limits and also the mineral rights to 98 per cent of the land under the city itself. These acquisitions were made because exploratory drillings revealed the presence of an iron ore body of such magnitude as to permit mining in the area for an estimated 100 years. No surface operations will be undertaken within the city limits, present or proposed, and the ore under the city will be reached by drifts or tunneling. The commencement of construction was reported as probably coming "within the next few years," with a suggestion "it might be ten or fifteen years." The witness, a geologist, was not really in position to speak on that subject. It was stated that the initial construction period would consume about five years with an employment of approximately 100 persons; also, that the project in production would employ a total of up to 900 persons.

The lake referred to in the testimony has apparently long been contemplated; it would come from the construction of a dam on the Meramec River near Sullivan. Impounded water would come within about two miles of plaintiff city. This project is said to have been approved by the Army Corps of Engineers, but obviously it is only in the planning stage. The city might expect some advantages from the recreation area created by such a dam if in fact it ever materializes.

Of the two tracts involved in the present annexation attempt, Tract No. 1 consists of 25 acres which lie in a strip immediately southeast of Interstate 44 and northwest of and contiguous to the southwestern extension of the city, as above noted. There is no access to that highway except at the extreme north end of the tract. One home occupies a four-acre tract; another three-acre tract is unoccupied and described by its owner as a "weed patch" on which he sometimes operates a sawmill. The remaining 18 acres in this parcel consist of two platted subdivisions which have been divided into 36 lots. Houses have been built on 14 to 21 of the lots (with no explanation of the ambiguity); substantially all of these have city water and receive fire protection.

Tract No. 2 consists of 130 acres more or less; it does not touch Tract No. 1. It lies generally along the southeasterly side of the southwest extension of the city's boundaries (as previously described); its northwesterly line is most irregular; it extends on to the southwest ending in a sharp point. The total northerly-southerly length of the tract is about one and one-half miles; Old Highway 66 runs along the westerly side of the tract (and along the Frisco) for about one-third of its length, but both to the north and south of that location it veers off through the tract itself. This tract defies any accurate word description. The southeast side of the tract abuts the Frisco right-of-way and extends along it for its full length. There are two churches in the north part of the tract, each on a lot of about two and one-half acres. Each church adjoins the present city limits. A Catholic church owns 12 acres acquired for future use; on this there is now no building. There are nine platted lots adjoining the city limits, on which five houses have been built. About eight other houses constitute the total remaining construction in the tract. Each of these is on what is described as a "small parcel." One couple owning eight acres pasture a few head of cattle and a horse. Another couple employs their small acreage to feed hogs.

The vast majority of this tract is undeveloped and vacant. One of the city's aldermen, who favored the annexation, owns 20 acres of the vacant land and has an option to purchase an additional 40 acres. His plans for this property are "[E]ventually a subdivision * * * for homes, residential," and he believes that if the land is taken into the city its value would increase. Some of the property at the north end of this tract is served with city water.

■■■ Section 71.015, RSMo 1959, V.A. M.S., commonly known as the "Sawyers Act," requires that the city's petition shall state facts showing: "2. That such annexation is reasonable and necessary to the proper development of said city; and 3. The ability of said city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after said annexation is to become effective." Since the passage of that act, the burden of establishing those elements by evidence rests squarely on the city which seeks to annex. City of Olivette v. Graeler, Mo., 338 S.W. 2d 827; City of Aurora v. Empire Dist. Electric Co., Mo.App., 354 S.W.2d 45; City of Tracy v. McCrea, Mo.App., 374 S.W.2d 553; City of Houston v. Duff, Mo.App., 338 S.W.2d 373; City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4. It is not the prerogative of a court, trial or appellate, to substitute its judgment or discretion for that of the city's legislative body, and if the evidence on the issues prevails in the city's favor or if the issues are debatable, the court should not interfere. Hankinson, supra; Empire Dist. Electric, supra; City of Fulton v. Dawson, Mo.App., 325 S.W.2d 505. But both parties, the city and the area proposed, are entitled to the benefit of the test of reasonableness. Graeler, supra; also, City of Olivette v. Graeler, Mo., 369 S.W. 2d 85. In other words, the annexation must be reasonable as to those living in the outside area, as well as to those living in the city.

We shall not set out here all the factors which may properly be considered, pro or con, in an annexation case. They are set

out rather fully in the following cases: Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236; City of Tracy v. McCrea, Mo.App., 374 S.W.2d 553; City of Fulton v. Dawson, supra; State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007; State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 228 S.W. 2d 762; City of St. Ann v. Buschard, Mo. App., 299 S.W.2d 546. We shall refer to certain of these factors later.

■■ We hold at the outset that we may not and shall not approve the annexation of one of the proposed tracts and reject the annexation of the other. It is true that the resolution describes the tracts separately, but it could hardly do otherwise as they are separated physically, and they lie largely on opposite sides of the south part of the city. The city adopted one single resolution for the annexation, authorized the filing of "an" action for declaratory judgment, and called for the holding of a single election if the annexation was approved. The preliminary paragraph of the resolution was as follows: "BE IT RESOLVED, by the Board of Aldermen of the City of Bourbon, Missouri, that the following described tracts of unincorporated land adjoining the City of Bourbon, Missouri, be annexed to the City of Bourbon, Missouri; that *the legal description* of said tracts of land is as follows:" (Emphasis is ours.) We cannot speculate as to what was in the minds of the aldermen; nor can we fairly say that they would have adopted a resolution for the annexation of one tract without the other. We may not substitute our judgment for that of the Board by holding, in effect, that it *should* only have annexed *so much and no more*. The proceeding was instituted and treated as *one* annexation and it must stand or fall as such. One petition was filed in one count, for one total annexation. We had regarded this proposition as relatively well settled by such cases as: City of St. Joseph v. Hankinson, Mo., 312 S.W. 2d 4; City of Aurora v. Empire Dist. Electric Co., Mo.App., 354 S.W.2d 45; City of Fulton v. Dawson, Mo.App., 325

S.W.2d 505, and State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007. In St. Joseph, supra, we said at 312 S.W.2d, loc. cit. 17–18: "It will not be our function here, if indeed it is ever proper, to say that the council might have more reasonably exercised its discretion if it had taken in less land and had excluded some of the outlying areas. In State ex inf. Mallet ex. rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 397, the court said, quoting with approval from the Major case: ' "It is no province of the court to substitute its own judgment of what would be the best or most advisable line for the extended limits; it is not its province to subtract or add to the territory selected by the municipality to be annexed; its sole duty is to examine the extension as actually attempted and to say whether it should remain. * * *" ' We examine the extension as actually enacted."

If we should approve one tract for annexation and disapprove the other, we would have traveled a long way toward a ruling that we could (and should) reduce the area of a single, sizable tract by holding that the annexation should stop at an expressway, a railroad, or a natural boundary, because of the diverse character of the land uses. So far, no one has contended that the courts should do that. In the only case we have seen to the contrary, Williams v. City of Illmo, Mo.App., 279 S.W.2d 196, the Springfield Court of Appeals approved the annexation of one tract and disapproved the other, with *no* discussion of the question of severability. It also held that the burden of establishing unreasonableness was upon the residents of the proposed areas, although the opinion was written well after the enactment of the Sawyers Act. In City of Aurora v. Empire Dist. Electric Co., Mo. App., 354 S.W.2d 45, the same court made a rather feeble effort to distinguish the Illmo case on its facts. We do not find that it is really distinguishable, and insofar as it ruled upon the tracts separately and thereby approved the annexation as *reduced,* it should no longer be followed. This is

also true of its reference to the burden of proof. It is obvious that the safest manner in which to propose the annexation of separate and distinct tracts is by separate proceedings; also, in that way the people of the city are permitted to express their choice upon each tract separately. If a city wishes to stand or fall upon the whole "package," it may proceed as plaintiff did here.

■ In arriving at our conclusion it will be necessary to discuss the tracts separately, for they are so treated in the evidence. This will involve some slight repetition. In Tract No. 1, consisting of 25 acres, there are two platted subdivisions of 36 lots with approximately 14 houses on them; there is also one other house on a four-acre tract, and a largely unused sawmill on the remaining tract of about three acres. This relatively narrow strip lies along the south part of the western city limits. The mere fact that a part of a tract is vacant or is used for agriculture does not, per se, prevent its annexation. Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, 249. This comparatively small tract might conceivably be considered as a place where the population of the city "has spilled over its boundaries." It appears to be reasonably well served with existing roads and streets; the occupants now have city water and fire protection available; it would seem to be reasonably well located for sewer service if that function is ever expanded. It does contain some vacant land, platted and unplatted, which might be used for housing; some of this land is now presumably held for sale as town lots; and the tract would seem to have some value existing by reason of its adaptability for "prospective town uses." The addition of this tract to the city would make its boundaries somewhat more regular. Counsel for defendants concede that: "It is, frankly, a debatable point as to whether or not the portion of the area designated as Parcel No. 1 might reasonably be annexed." It is true that those who testified from that area opposed annexation

but that is not a controlling test. If the reasonableness of an annexation is "debatable," that ends the matter, so far as the courts are concerned; see cases already cited. If this area alone was sought, the annexation might well be sustained.

■ Tract No. 2, already generally described, is an area about two-fifths as large as the total present area of the city. It has no roads or streets except two old highways which border it and, to a lesser extent, run through it. In its 130 acres it contains only nine platted lots (with five houses) which, by means of a very irregular line, were omitted in the last annexation. There are approximately eight other houses on the tract and these are on plots of a few acres so situated and arranged as to be most dissimilar to ground platted for urban-type dwellings. There is no evidence that a 3.2 beer tavern within the confines of Tract No. 2 needs policing or that the two churches require municipal supervision. The rest of Tract No. 2, constituting by far its greatest area, is vacant. There is no indication that the population of the city has "spilled over" onto this tract or that the territory has taken on the character of urban property. The residents were divided in their views on annexation but this is not in any sense controlling, as indicated. One of those favoring it was an alderman who owned 20 acres of the tract and had an option to purchase 40 more. The evidence of a supposed housing shortage in the city is not compelling; there is vacant land in the city (approximately 60 acres, exclusive of platted lots) most of which undoubtedly could be used, under proper circumstances, for that purpose and presumably will be. The town has certainly had no explosive growth and the hopes for much future expansion are not based on any immediate, concrete prospects. There certainly has not as yet been any exodus of the citizens into Tract No. 2 in search of homes. The area is not needed for any extension of streets or utility lines, or presently "to supply places of abode or business of its

residents * * *." Crestwood, supra. Only four houses had been built upon the 38 platted lots in the Siebenman Acreage Subdivision, with an estimated 45 acres still unplatted, and at least one-half thereof is desirable for homesites. A city should not be denied annexation simply because there are vacant lots within its boundaries; and neither should it be foreclosed from making reasonable provisions for the foreseeable future. However, what is reasonable for the future should be judged chiefly from the known and existing facts.

It does not definitely appear that plaintiff has furnished or will furnish city water to any residents of Tract No. 2 in the near future unless they run their own lines; they now have fire protection and police service (through deputy sheriffs) when desired. Under existing circumstances it is impossible to visualize sewer services to this area in the foreseeable future when from one-half to three-fourths of the present area of the city does not have it. The distance from the south end of the sewer line to the south end of Tract No. 2 is one and one-half miles. The addition of this area would make the boundaries of the city still more irregular by adding a long, attenuated point to the south; it would have nothing directly to do with the operation of the proposed mine, for which land has been bought elsewhere, outside the city. Plaintiff does not propose to extend any streets into this area. The plaintiff has failed to show that the annexation of Tract No. 2 is reasonable or necessary to the proper development of the city; we need not discuss further its ability to furnish its "normal municipal services" to the area within a reasonable time. If the first statutory requirement fails, the annexation is per se, unreasonable. We do not consider that question, on the present evidence, to be "debatable."

Since we have held this annexation to be unreasonable and arbitrary in what is, by far, its greater part, we so rule with reference to the entire annexation. What the city may do in the future is strictly a matter of its own choice.

The judgment is reversed and the trial court is directed to dismiss plaintiff's petition.

All concur.