**CITY OF ROCK PORT, a Municipal Corporation, Respondent,**

v.

**ATCHISON COUNTY COOPERATIVE ASSOCIATION, Richard Altman, Atchison County, Missouri, Doyne Shelton, S. M. Burke, Willis Burke, Marvin Bell, Gilbert Burke, Charles Burke, Reed Burke, Joan Bell and Betty Shelton, Appellants,**

Rolla Cook, Atchison-Holt Electric Cooperative, Wilma Brakeman, Guy Andermann, Mildred Phelps, Melvin E. Rolf, William Otis Alleshouse, Katheryn Knowles, Annabelle Mellen and Edith L. Holliway, Defendants.

**No. 53142.**

Supreme Court of Missouri, Division No. 1.

Oct. 14, 1968.

exclusive appellate jurisdiction since Atchison County, Missouri, is the owner of part of the land proposed to be annexed and is an appealing defendant.

Rock Port, in the northwest section of Missouri, is a city of the fourth class and the county seat of Atchison County. These proceedings began with the adoption by city's Board of Aldermen (often referred to in evidence as the City Council) of a resolution to annex certain unincorporated areas of land and authorizing the city's attorney to file this declaratory judgment action. By subsequent proceedings the city council adopted an amended resolution making some changes in the area to be annexed and a conforming amended petition, on which this case was tried, was filed on September 6, 1966.

After a five day non-jury trial concluded on February 28, 1967, and recorded in the 955 page transcript, with a multiplicity of maps, charts, ordinances and other exhibits admitted in evidence, this cause was taken under submission by the trial judge. On May 2, 1967, judgment was entered in favor of the plaintiff, City of Rock Port, the trial court finding, among other matters,

"* * * that the annexation of the lands sought to be annexed is reasonable and necessary to the future growth of the City of Rock Port, Missouri and the city has the capacity to offer to such areas the usual and customary municipal services."

After unavailing motions for new trial, the case was duly appealed to this court by some of the defendants.

We note at the very outset that this cause was tried and the judgment entered herein prior to November 13, 1967, the date of this court's En Banc decision in the case of City of Bourbon v. Miller, Mo., 420 S.W.2d 296, 300–301, in which the court said:

"Section 71.015, RSMo 1959, V.A.M.S., commonly known as the 'Sawyers Act', requires that the city's petition shall state facts showing: '2. That such annexa-

Frank H. Strong, Maryville, for respondent, City of Rock Port.

Walter L. Mulvania, Rock Port, for appellants, Atchison County Cooperative Ass'n, Doyne Shelton and Betty Shelton, Marvin Bell and Joan Bell.

Bernard W. Gorman, Tarkio, for appellants, Richard Altman, Atchison County, Mo., Willis Burke, Gilbert Burke, Charles Burke and Reed Burke.

JOHN C. CASEY, Special Judge.

This is an appeal from a declaratory judgment authorizing the City of Rock Port to proceed in the annexation of certain areas abutting the city under the provisions of Section 71.015 RSMo 1959, V.A.M.S. often referred to as the Sawyers Act. It is conceded by all parties that this court has

tion is reasonable and necessary to the proper development of said city; and 3. The ability of said city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after said annexation is to become effective.' Since the passage of that act, the burden of establishing those elements by evidence rests squarely on the city which seeks to annex. (Citing cases) It is not the prerogative of a court, trial or appellate, to substitute its judgment or discretion for that of the city's legislative body, and if the evidence on the issues prevails in the city's favor or if the issues are debatable, the court should not interfere. (Citing cases) In other words, the annexation must be reasonable as to those living in the outside area, as well as to those living in the city. * * * "

Further in that opinion it was said (loc. cit. 301):

"We hold at the outset that we may not and shall not approve the annexation of one of the proposed tracts and reject the annexation of the other. It is true that the resolution describes the tracts separately, but it could hardly do otherwise as they are separated physically, and they lie largely on opposite sides of the south part of the city. The city adopted one single resolution for the annexation, authorized the filing of 'an' action for declaratory judgment, and called for the holding of a single election if the annexation was approved. * * * "

In the instant case there is also just one annexation resolution embracing all of the area which the City of Rock Port sought to be annexed. Thus we are confronted with a situation where neither trial counsel nor the circuit judge were previously fully aware of guidelines set out in the City of Bourbon case supra.

The issues originally pleaded and tried have been greatly narrowed on appeal since defendants present only four points, which may be summarized as the court's erroneous findings that: (1) The plaintiff establish-ed the need of annexing the proposed area and that it was reasonable for the future development of the city. (2) The annexation of the proposed area was reasonable for the reason that the evidence failed to show there were corresponding benefits from the municipal services of the city to those owning lands in the proposed annexed area, which municipal services include water, sewer, fire protection and police protection. (3) The plaintiff is able to furnish normal municipal services of the city to the unincorporated area within a reasonable time after the annexation becomes effective. (4) It is reasonable to anticipate the city may expect a sizable future growth by the development of the atomic generating plant to be constructed in Nebraska, about 15 miles from Rock Port.

The last point is probably well taken. However, since it would not affect the conclusion we have reached in this case, we will disregard such specific findings of the trial court in this opinion.

Rock Port is roughly in the shape of one square mile with certain modifications hereafter discussed, and now contains about six hundred acres. It is located in the northwest tip of Missouri on a federal highway carrying both numbers U.S. 136 and U.S. 275, which we will refer to only as Highway 136. Missouri Highway 111 runs northwardly through the approximate center of the city, ending as a numbered Missouri highway, at its junction with Highway 136 in the north part of Rock Port.

The city seeks to annex approximately 522 acres, a substantial part of which lies along Highway 136 both to the east and to the west of the present city limits. Another part of the area sought to be annexed (hereafter referred to as the Area), comprises land lying on both sides of Missouri Highway 111 immediately south of the present city limits. A third part of the Area, located to the east of the present city limits, is largely composed of the municipally owned park and golf course and the land adja-

cent thereto. The last portion of the Area which we will discuss lies immediately north of the northernmost city limits on both sides of a county road, running in a generally northerly direction from Highway 136. There has been no expansion of the city limits since about 1925.

According to the 1960 census Rock Port had a population of 1,310. The superintendent of the city's Board of Public Works testified that the number of residential metered water stations rose from 432 in 1960 to 531 in 1967, and, based on a ratio of 3.03 persons per meter, the 1967 population would approximate 1,600. The superintendent of schools testified from records that the total number of students in the district school rose from 563 in 1959–60 to 689 in 1966–67, approximately 45% of the student body living in the City of Rock Port. We find ample evidence of record to support the trial court's finding that " * * * the present population estimated upon utility users and pupils in school approximates 1,600, an increase of about 300 * * * " over the 1960 census figures of 1,310.

A substantial factor in the recent growth of Rock Port appeared to be closely related to the recent construction of the largest industry in the vicinity, the "Missouri Beef Packers, Inc." plant. This slaughterhouse is located on Highway 136, about six miles west of Rock Port. Construction work on this plant started in May, 1965, and operations, consisting principally of the slaughter of 1,000 to 1,500 head of beef a day, began in February, 1966. That plant employs 236 persons, of which 83, or about 35%, lived in or about Rock Port, the closest city of over 500 population. Other employees live at greater distances, some in Nebraska, others in Iowa. The Company manager, Mr. William Gilbert, a Rock Port resident, testified that it was his policy, in order to avoid absenteeism in bad weather, to encourage employees to move closer to the plant; that in his opinion the presence of these 236 employees and their families had an impact upon and increased the commercial enter-

prises and businesses of the Rock Port region, and that there was a definite need in Rock Port for additional housing for such employees, especially homes in the $10,000 to $15,000 price bracket. Other evidence indicated that there was a great scarcity of suitable houses for rent in or near Rock Port.

The city owns an adequate water plant with drilled wells, purifying equipment and storage tanks of 360,000 gallon capacity, including a new 200,000 gallon tank. It furnishes water to houses and businesses in the city and to some customers outside the city limits, at a charge of 150% of the rate for commercial or residential water users inside the city. Fire hydrants are placed along the water mains at strategic locations. The water plant is in good operating condition. The Superintendent of the city's Board of Public Works expressed the opinion that the city could, within a reasonable time, furnish the Area with a sufficient quantity of good water.

Rock Port operates its own municipal electric plant, serviced by two new generators and some older equipment capable of producing over 3,000 Kilowatts, sufficient to meet its ordinary needs. In addition, the city has an interconnecting grid line arrangement with defendant Atchison-Holt Electric Cooperative, sometimes referred to in evidence as the R.E.A., for the purchase of additional electric current when needed.

The city operates a sanitary sewer system with lagoon disposal facilities. All but six houses in the city are connected to sewer pipes and those not using the sewers are not charged. Some places in the Area outside of the city limits are served by such sewage system. There was evidence that the disposal lagoons had a capacity to serve 2,800 people.

The city fire department equipment includes one Mack truck, another modern fire truck on order, under a recently passed $26,000 bond issue, and other adequate equipment. The department is operated under a fire chief and 17 volunteers paid on

a nominal fee-per-call basis. This department has the mandatory duty of fighting all fires inside the city limits. Many of its members are also in the Rural Fire Association which answers rural calls of only those who pay dues. Two fire trucks of that association are available for city emergency use.

American Gas Company serves the city by a natural gas distribution system under a city franchise, and telephone service is available under contract with the Rock Port Telephone Company, which was converting to dial equipment at the time of trial.

The city also owns other facilities, including a new swimming pool, a park and a municipal golf course, which are outside of the present city limits but within a part of the Area. Most of the land used by the country club is owned by the city and the balance is leased from certain non-contesting defendants, as hereafter more fully discussed.

Rock Port is in an essentially healthy financial condition. In 1961 the city had assessed valuations of real estate totaling $1,053,078, personal property $257,225, and merchants of $102,270, a grand total of $1,412,573, with a tax levy of $2.60, and a tax to be collected of $36,745. By 1966 these figures had increased to a total valuation of $1,983,475, which, at a lower tax rate, produced taxes in excess of $44,000. The city has general obligation bonds of $139,000, including $39,000 for the new swimming pool, and revenue bonds of $52,000. Payments on such bonds, as well as all other expenses, have been current and the city has a cash balance on hand of $187,313. The city electric plant operated separately has a deferred payment contract obligation of $182,803, for two recently installed Fairbanks-Morse generators, payable out of electric revenue at $2,014 per month. The city also owes a balance of $18,200 on a recently built 200,000 gallon water storage tank, with payments thereon being made at the rate of $300 per month. In substance

the evidence warrants the conclusion that Rock Port has demonstrated its ability to carry out its commitments and is in a sound financial condition.

Rock Port has modern, well-drafted zoning and subdivision ordinances, each adopted November 2, 1965. Atchison County has no zoning ordinance nor any other regulations on the use of land. The city has employed the firm of Harland Bartholomew and Associates of St. Louis to make a comprehensive study of its over-all needs, but the report was not completed nor further elucidated at the trial.

The city has one police officer, who works staggered shifts on an unpublished schedule, so that potential wrong-doers will not be advised of the times he is on duty. It is also protected, as is the rest of Atchison County, by the Sheriff and his deputy working out of Rock Port, the county seat. The city proposes to add another police officer upon annexation of the Area. Evidence adduced by both city and defendants indicated that there were no real police problems, either in the city or in the Area.

In addition to the above facts it would be fair to state that by questions propounded to the former mayor, present mayor, engineer, city officials and other witnesses the plaintiff city did elicit sufficient opinion evidence to make a prima facie case under subsections 2 and 3 of the "Sawyers Act."

### PRESENT CITY BOUNDARIES

As clearly shown by the maps and charts, Rock Port is roughly in the shape of one square mile, with the following additions and deletions: 1. An addition of about 60 acres, constituting an extension northwardly for a distance of one-quarter mile immediately north of the center part of such square mile dimension, bounded on the west by a line one-quarter mile east of the mile long west city limits, and bounded on the east by Rock Creek. We shall refer to this as the northern projection of Rock Port. 2.

An addition of a parcel of land along both sides of Missouri Highway 111, south of such square mile dimension, extending an irregular distance southwardly for a maximum depth of about 450 feet by an irregular distance from east to west of about 1,200 feet. 3. A deletion of somewhat over 90 acres of the southwest quarter of such square mile dimension, since the city limits in that quadrant is now bounded on the east by the irregular course of Rock Creek to its intersection with the south line of such general square mile dimension, lying between such city limits and Highway 136.

## AREA SOUGHT TO BE ANNEXED

We believe that the issues may be made more readily understood and discussed if we treat portions of the Area as separate tracts, as was done in the case of City of Bourbon v. Miller, supra.

The first part of the Area which we designate, for convenience, as Tract No. 1–A, embraces a strip of land approximately one mile long (east-west) by one quarter mile wide (north-south). This extends westwardly from the northern projection of Rock Port for a quarter mile along the north line of the city's square mile dimension and continues for a distance of approximately three-fourths of a mile west of the westernmost present city limits. Highway 136 runs in a general east-west direction through the one mile length of this Tract No. 1–A.

Since the evidence indicated that the eastern half of this land was in the past all owned by one Carl H. Tiemeyer, and the greater portion is still owned by him, we will refer to this as the Tiemeyer land. A part of this, fronting the south side of Highway 136 and extending westwardly for a distance of about 1,500 feet from the west city limits of the northern projection of Rock Port was sold to appellant Atchison County Cooperative Association. From the maps and testimony this parcel has an irregular depth southwardly from the highway of about 300 feet. That Cooperative uses a part of its property for elevator and feed mixing operations, purchases water from the city but has its own septic tanks for sewage. Charles Hurst, its president, testified that twice recently proposals to buy part of this land for business purposes were turned down as the concern would need all the land as business increases. He testified, " * * * sometimes you have problems like anhydrous ammonia and things like that * * *". He further testified that he didn't know the effects of the Rock Port zoning ordinances; that the company might get into trouble if they wanted to add something new to the plant and that " * * * as cities grow and towns they do push those things out a little further." There was also evidence that the cooperative had another fertilizer and chemical building and a few tanks on the north side of Highway 136 east of Rock Creek in Tract No. 1–B.

Other parcels of the Tiemeyer land highway frontage had been sold to and used by various other parties. One parcel, fronting about 500 feet on the north side of the highway, was sold to the Chamberlains. The father, George Chamberlain, uses part of his in his floral business, and his son, Gregory Chamberlain, a licensed mortician, intends to build a funeral home there. The Top Kick Cafe, operated with a beer license and no inside toilet facilities, is located on the north side of the highway between the Chamberlain property and the city limits, in this Tiemeyer part of the Area. On the south side of Highway 136 Tiemeyer had sold a parcel to Leslie Long and his wife, who use it for a package liquor store, and a site for their trailer home. Immediately east of this liquor store and on the south side of Highway 136 is a parcel of the Tiemeyer land presently owned by Texaco, Inc. and used as a bulk bottle gas and storage facility. There was additional evidence that other parts of this Tiemeyer land were being cleared of timber and bulldozed. There was further substantial evidence that other areas in the southern part of the Tiemeyer land further re-

moved from Highway 136 could be developed for residential purposes.

Immediately west of such Tiemeyer land in Tract 1–A is a square 40 acre parcel of land, 1320′ by 1320′, roughly bisected by Highway 136 and owned by appellant Richard Altman and his wife. Under a 99 year contract the Altmans lease a little over one acre of this land to the Dempsey-Harden Oil Company for filling station use under the name Top Kick Oil Company, at $1,000 per year, with the lessee paying taxes on the building. The Altmans also lease some land for a fireworks stand for two weeks a year for $200. Altman testified that none of his land was for sale and that he had formed a corporation, Altman Homestead, Inc., placing this land under option to such corporation for the purpose of leasing it for commercial and industrial uses.

Immediately west of the Altman property is a similer square 40 acre plot in Tract No. 1–A. From about the west line of Altman's land Highway 136 begins to turn toward the northwest through this 40 acres. Defendant Rolla Cook (who was present at the trial representing himself but took no further part in the proceedings) owns about 30 acres of this land, that lying south and west of Highway 136. All the remainder, about 10 acres, north and east of the highway is owned by Orville K. and Donald Wolf who were not named as defendants and took no part in the proceedings. Missouri Highway 4 branches off U. S. Highway 136 at about the junction of the Altman, Cook and Wolf properties and runs in a general south and west direction through the Cook land in this tract. There was a paucity of evidence regarding the Cook and Wolf properties, but in view of the conclusion reached in this case we do not deem it necessary to discuss the matter further.

## TRACT NO. 1–B

The next portion of the Area to be considered will be referred to as Tract 1–B and includes the land on both sides of Highway 136 from Rock Creek, the eastern boundary of the northern projection of Rock Port, eastwardly for about 4,000 feet to a line ½ mile east of the easternmost limits of the square mile dimensions of the city. The effect of annexation of Tract 1–B would be to add about 660 feet to the north and about 660 feet to the south of Highway 136 for a distance of about ½ mile west of the present westernmost city limits.

In general, the evidence indicated that industrial, business and commercial uses are being made of part of this tract extending outward and east from the city limits, somewhat similar to the development of Tract No. 1–A previously discussed.

The land on the north side of Highway 136 from the eastern city limits of the northern projection of Rock Port, extending east for about 1,800 feet was previously owned by appellant S. M. Burke. He had sold parts of this highway frontage to the cooperative, another tract of about 4 acres to the appellant Atchinson Holt Electric concern for $1,000 per acre in 1957, and a parcel fronting 300 feet along the highway by a depth northwardly of about 160 feet to the American Legion at $10 per front foot or $3,000. His son Jim lives on and farms the remainder of this Burke land north of Highway 136. S. M. Burke still owns several hundred feet of the north highway frontage, through which a road could be constructed to provide access to his farm land. He testified that he had never developed any of such land by running sewer or water lines through it but had sold the bare ground allowing others to develop it. Burke further testified: "I have had a chance to sell it three times, just on the other side of the American Legion, and I wouldn't sell it to them because they were putting stuff in there I didn't want."

Abutting that S. M. Burke land on the east is a farm owned by Herbert and Gertrude Melvin. About 20 acres of this land fronting 1,320 feet along the north line of Highway 136 by a depth of about

660 feet is included in the Area. The Melvins took no part in the trial and did not appeal. There was no evidence regarding their future plans for the use of this land. Immediately east of the Melvin land is a farm owned by August H. and Wilma Brakeman. The twenty acres of that farm in this tract 1–B fronts the north line of Highway 136 for a distance of about 1,320 feet to the extreme west line of the area sought to be annexed and has a depth northwardly of about 660 feet. Wilma Brakeman, named as a party defendant, appeared at the trial with her husband, August Brakeman, and was represented throughout the trial by attorney J. M. Gerlash. She testified that she would not want to sell any part of her land. The Brakemans filed no motion for new trial and took no appeal.

On the south side of Highway 136 the the westernmost parcel in the Tract 1–B is owned by Christian and Katherine Husing. It is somewhat irregularly square in shape and appears from the map to be about 300 by 300 feet. It is bounded on both the west and south by the present city limits. Mr. Fuellinger, a real estate broker familiar with the entire area, testified that this is "the very best location there", and that he had possibilities of selling part of it had it been available. Abutting the Husing land on the east is a somewhat triangular parcel of ground owned by Darrell and Mary Groff, fronting the south side of Highway 136 for a distance east of about 1,000 feet. This land has an irregular depth south tapering from about 300 feet at its west line to apparently less than 100 feet at its eastern extremity which is co-extensive with the present eastern city limits of Rock Port. This Groff property is bounded on the south by the present city limits. Neither the Husings nor the Groffs were joined as defendants, intervened, testified or took any part in the proceedings. There was practically no evidence adduced in contradiction of the city's testimony that the annexation of such land was reasonable and necessary.

East of the Groff property and fronting the south side of Highway 136 for the next quarter mile east is a second parcel of land owned and operated as a farm by the aforementioned S. M. Burke. This is bounded on the west by the present city limits line and on the east by about 20 acres of land owned by his son Willis M. Burke. The property of appellant Willis M. Burke in this tract 1–B extends an additional quarter mile eastwardly along Highway 136 to the east line of the area proposed to be annexed by a depth of approximately 660 feet southwardly from the highway. Willis had transferred title to three small parcels of this land to his sons, appellants Gilbert Burke, Charles Burke and Reed Burke. In effect all of the land in this Tract 1–B for a depth of about 660 feet south of Highway 136 from the present city limits for one-half mile east along the highway to the proposed new city limits is owned by the Burke appellants, father, son, and grandsons.

The testimony indicated that a good deal of this land was hilly as is most of the terrain in and around Rock Port. In this Tract No. 1–B Willis Burke operates trailer court for 21 trailers, housing about 80 persons, served by well water and sewage septic tanks with disposal fields. Willis Burke also has a lumber yard of considerable size abutting Highway 136 close to the west end of this Tract No. 1–B and, with his sons, operates a subdivision development and home construction business. They had built and sold over 30 homes in Rock Port and at the time of trial owned a number of lots in the developed Burke Addition in the city.

The city adduced substantially uncontroverted evidence that there was a definite shortage of suitable commercial and industrial sites in Rock Port. There has been considerable commercial and industrial use of the land along Highway 136, both to the west and east of the city, and more can be anticipated in these Tracts 1–A and 1–B. It was fairly established that all the land in these tracts had a worth

in excess of its value for purely agricultural purposes by reason of its location along Highway 136 and proximity to the city.

Commercial and industrial expansion has usually been considered an important factor justifying expansion. City of Cape Girardeau v. Armstrong, Mo.App., 417 S.W.2d 661, 677. Annexation should be infrequent and the city should be permitted to make reasonable provision for the foreseeable future. City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 18.

Because of the result reached in this case we will not undertake to discuss the questions of the proof of the reasonableness or necessity of the annexation of every bit of the land in these Tracts Nos. 1-A and 1-B, the quantum of proof adduced with reference to corresponding benefits flowing to the land owners nor the sufficiency of the evidence regarding the city's plans or ability to furnish normal municipal services in the reasonable future. However, nothing we have said with reference to these Tracts Nos. 1-A and 1-B should be construed as a finding that the annexation of any or all of these parts of the Area might not well be sustained.

## TRACT NO. 2

The next part of the Area which we designate as Tract No. 2, is located due south of the present city limits and on both sides of Missouri Highway 111 at its southern entrance to the city. The net effect of the annexation of this tract of about 24 acres would be to extend the existing southern city limits about 200 feet further to the south along both sides of Missouri Highway 111 for a distance of about 1,400 feet west of that road, and straighten the present jagged southeast limits by extending the proposed new city limits eastwardly in a continuous line for about 700 feet east of Highway 111 to Rock Creek, a more or less natural boundary. At the time of filing of this suit

this land was held in the names of three families of owners, but at trial, for practical purposes, only one remained in the case and that family offered no opposition. Briefly, the eastern 10 acres of this tract was jointly owned by defendants Katheryn Knowles, Otis Alleshouse and Annabelle Mellen. An answer was filed to the original petition by their attorney, J. M. Gerlash. On inquiry by the trial judge and the city's counsel regarding appearances of the respective parties at the beginning of the trial, Mr. Gerlash stated "* * * these folks have decided not to defend any further * * *." Since the annexation boundaries were changed in the amended petition Mr. Gerlash thereupon advised the court that no answer would be filed to the amended petition, thus taking those three defendants out of the case. Mr. Gerlash thereafter participated throughout the trial, but only as attorney for the Brakemans, who, as previously mentioned, did not appeal.

The majority of the balance of Tract No. 2 was owned at the time of the filing of the suit by defendant Edith L. Holliway and her husband. However, at trial it was shown that the Holliways had sold all such property to the remaining owners Rex E. and Betty Jo Husted, who had previously owned only a homesite abutting the south city limits and fronting the west side of Missouri Highway 111. The Husted house, rented to a tenant, is presently served by the city sewage system. The Husteds were not named as defendants, did not intervene nor participate in tthe trial and took no appeal. There was little or no evidence to refute the city's prima facie case on the annexation of this land.

## TRACT NO. 3

The next part of the Area, which we designate Tract No. 3, consists, principally, of about 60 acres in the southwest quarter of the general square mile dimension previously mentioned, but lies east of Rock Creek, the present eastern city limits in

that quadrant. The major portion of this land is now owned by the city and used for its park, new swimming pool and municipal golf course, often referred to as its country club. In addition to the land used for such municipal purposes and owned by Rock Port, the proposed new city limits would be extended about 660 feet southwardly along from the approximate 1,700 foot south line of the municipally owned ground. Immediately south of the west part of the city owned country club is a tract of several acres rented by the city for use as part of the golf course from its owners, the previously mentioned defendants Knowles, Alleshouse and Mellen, who practically took themselves out of this case. Under the facts and in view of the lack of any substantial contention to the contrary, we conclude that the evidence on the issues of the reasonableness and necessity of the city's annexation of its municipally owned swimming pool, park and golf course, preponderated heavily in favor of the city.

Bearing in mind this conclusion we continue with the consideration of the question of whether the annexation of the balance of the land in this Tract No. 3 is reasonable and necessary to the proper development of Rock Port. Abutting the east line of the Knowles property and extending eastwardly for about 1,320 feet along the south line of the golf course, by a depth southwardly of approximately 660 feet in this part of the area is a parcel of about 20 acres owned by Harry and Lillie Clement and presently used for farming purposes. From the maps, aerial photograph and evidence this would appear to constitute a sort of a 660 foot wide buffer zone along the south line of the city's country club. The Clements were not named as defendants and did not intervene nor participate in these proceedings so crucially affecting about 20 acres of their land. We believe that in the total absence of any Atchison County zoning restrictions Rock Port should have " * * * a voice in its orderly growth and zoning." City of

St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 18.

The petition also seeks the annexation of a strip of land about 330 feet wide extending along the entire quarter mile east line of the golf course and northwardly in a straight line to the connection of this strip with that part of the Area previously referred to as Tract No. 1–B fronting U.S. Highway 136.

Defendant Mildred Phelps owns the majority of the 330 foot strip of land abutting the quarter mile east line of the country club. At the extreme north end of her property, and abutting the northeast corner of the golf course, is the homesite of Robert and Margaret Phelps. None of these persons were named as defendants, intervened or took part in the trial proceedings. Although there was no direct testimony regarding its future use, the Phelps property would appear to constitute a sort of a buffer zone along the east line of the municipally owned golf course.

Defendant Guy Andermann and his wife own the land immediately north of the Phelps property. The extension of the line of the proposed new city limits would result in the annexation of that part of the Andermann farm land abutting the present east city limits along its north-south line for one-quarter of a mile by a depth eastwardly of 330 feet. The Andermanns filed no answer and took no part in the proceedings. The farm land in the remainder of this 330 foot strip abutting the eastern city limits is owned by the previously mentioned defendant-appellant S. M. Burke. The net result of the extension of such 330 foot strip north of the north end of the golf course would be to make the proposed north line of the city limits a straight line. We find little evidence in the record pertaining to the reasons for annexing such strip but, under the result reached in the determination of this case, we do not consider it necessary

to go into further detail regarding this Tract No. 3.

## TRACT NO. 4

The last part of the Area, which we designate Tract No. 4, embracing about 80 acres, abuts and lies north of the present city limits of the northern projection of Rock Port. In general the annexation proposed has the effect of extending the city limits an additional 2,000 feet to the north. A county road referred to a Rainbow Drive, runs through this Tract No. 4 in a general northerly direction. This road appears from the testimony, aerial photograph and the maps introduced in evidence to be somewhat like a continuation of Missouri Highway 111 northwardly from its junction with U.S. Highway 136. All of the land west of the county road in this tract, constituting about two-thirds, is owned by appellant Atchison County. The remaining third of the tract, about 25 acres, lying east of the county road, is owned by appellants Doyne and Betty Shelton.

At the extreme west end of that county-owned property is the "Pleasant View Rest Home", housing about 75 elderly people. This home is operated by a Mr. and Mrs. Stevens under a lease contract with the county, and is served with city water through a main running along the west edge of such county road. Sewage from the home runs through a line some 300 feet west of the water main and connects with the city's sewage system. Other than the group of buildings constituting the rest home, there were no other houses or businesses located on such county-owned property. There was substantial evidence that Rainbow Drive, the county road, ran along a ridge through the 2,000 foot length of Tract No. 4, so that only a strip varying from about 100 to about 300 feet to the west of the county road was sufficiently level for residential development. There was not an iota of evidence that any such land was necessary for any industrial or business purposes. To the west of this comparatively level strip the land fell off

sharply downhill to the west. Mr. Fuelling, the city's real estate witness, estimated that the land to the west dropped off about one hundred feet. This slope was in grass or permanent pasture. From measurements made on a detailed map in evidence it appears that the average depth, westwardly from the county road, of this Atchison County property was about 1,200 feet. There was a paucity of evidence regarding the western part of this county property, but from the aerial map it appeared to be farm land. There was some rather vague testimony that a road could be laid through some land in the city to connect a city street with the flatter west part of this county-owned property and thus make it available for residential development. However, there was not sufficient evidence in the record to carry the city's burden of proving that there was a fairly debatable question that the annexation of all of this county-owned land was reasonable and necessary to the proper development of the city.

All of the land on the east side of the county road in this Tract No. 4 is owned by appellants Doyne Shelton and his wife Betty Shelton, and is used by them in their business of raising cattle. The overwhelming weight of the evidence indicated that the great majority of the Shelton land sloped steeply to the east from the east edge of the county road. The only house along the entire 2,000 foot county road frontage, by the depth northwardly in the Shelton land sought to be annexed of about 660', was the Shelton house. Doyne Shelton testified that the roof of his house was about even with the level of the road, and that it would be virtually impossible to connect any of his property with the present sewer line running 300 feet west of the west side of Rainbow Drive because of the intervening ridge. He further testified that his ground was in permanent pasture because of its "sugar clay" character and great slope and that it would wash away or erode if he attempted to raise grain crops. On cross-examination, the city's real estate expert, Mr. Fuelling,

admitted that he had made previous statements to Mrs. Shelton if he had his way the Shelton property would not be included in the area sought to be annexed. He did not testify differently at the trial. The trial court specifically found "A small portion of the land, the Shelton 20 or 25 acres, was so precipitous as not to be usable for development without exorbitant expense."

There was no evidence whatsoever that the city needed either the county-owned property nor the Shelton pasture land for any extension of streets or utility lines, construction of water storage facilities, sewage treatment plants nor any other municipal purposes. Likewise, there was a total absence of proof that the land in this Tract No. 4 was needed to supply places of business for the city's residents.

We conclude that on consideration of all of the evidence, the city has failed to adduce sufficient proof to make "debatable" the question of whether the annexation of Tract No. 4 is reasonable or necessary to the proper development of Rock Port. With the failure to establish that first statutory requirement the annexation is, per se, unreasonable. City of Bourbon v. Miller, supra, 420 S.W.2d l. c. 303.

In the present case, there was but one annexation ordinance as in the City of Bourbon case, in which this court, En Banc, stated:

> "It is obvious that the safest manner in which to propose the annexation of separate and distinct tracts is by separate proceedings; also, in that way the people of the city are permitted to express their choice upon each tract separately. If a city wishes to stand or fall upon the whole 'package,' it may proceed as plaintiff did here." l. c. 302.

The judgment is reversed and the trial court is directed to dismiss plaintiff's petition.

HENLEY, P. J., and STORCKMAN, J., concur.

SEILER, J., not sitting.